**SAVINGS BANK OF ROCKLAND COUNTY, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

**No. 86 Civ. 5791 (RWS).**

United States District Court,
S.D. New York.

Aug. 7, 1987.

Lane & Mittendorf, New York City, for plaintiff; Christopher R. Belmonte, of counsel.

Marc E. Wieman, New York City, for defendant.

## OPINION

SWEET, District Judge.

In this action arising out of the insolvency and subsequent receivership of Peoples National Bank of Rockland County ("Peoples"), plaintiff, The Savings Bank of Rockland County ("Rockland"), by motion returnable June 26, 1987, has moved for an order pursuant to Rule 56(a), Fed.R.Civ.P., granting summary judgment in its favor against defendant The Federal Deposit Insurance Corporation ("FDIC") as receiver for Peoples.

The FDIC has cross-moved for an order pursuant to Rule 56(b), Fed.R.Civ.P., granting it summary judgment against Rockland on Rockland's claims and permitting the FDIC to set-off against any indebtedness of Peoples a $100,000 deposit maintained by Peoples at Rockland, plus interest. For the reasons discussed below, Rockland's motions for summary judgment are granted, and the FDIC's cross-motions are denied.

Rockland sought to be adjudged the owner of loans "purchased" by Rockland pursuant to a Loan Participation Agreement, entered into with Peoples on January 4,

1985, to the extent of 80%, and to be awarded reclamation of its share of principal and interest collected under the loans. Alternatively, Rockland requested a determination that on equitable grounds it is entitled to recover its 80% interest in loan collections previously made in preference to the general pro rata distribution of receivership assets to creditors of the insolvent Peoples, and that it is entitled to remittances of its 80% share of future loan collections. In either event, Rockland seeks an award fixing the amount of and allowing its general creditor claim against the receivership estate based on Peoples' breach (and the FDIC's disaffirmance) of the contractual undertakings in the Loan Participation Agreement (a) to make payments to Rockland sufficient for it to earn $13\frac{1}{4}\%$ per annum as net interest on its investment in the loans, and (b) to repurchase Rockland's interest in any loans in default for 90 days or more.

Rockland previously moved for partial summary judgment concerning whether the amount of the receiver's certificate issued to Rockland should be augmented by the $100,000 deposit of Peoples at Rockland, allegedly held as security for performance of Peoples' obligations under the Loan Participation Agreement. The motion was denied by the court's memorandum and order, dated January 27, 1987. By motion submitted for decision on May 15, 1987, Rockland has also moved pursuant to Rule 60(b), Fed.R.Civ.P., for relief from the January 27, 1987 order on the ground that newly discovered evidence requires reversal.

*Findings of Fact*

The following facts are undisputed by the parties.

On January 4, 1983, Rockland and Peoples entered into a written Loan Participation Agreement which provided that Rockland "hereby purchases" and Peoples "hereby sells" an 80% interest in each of 164 promissory notes. Most of the notes were originated by two Connecticut entities, Community Federal Savings and Loan Association of Bridgeport ("Community

Federal") and Madison Residential Real Estate Limited Partnership 2012 of Greenwich ("Madison"), and subsequently sold without recourse to Peoples. Peoples made none of the loans in the first instance and did not service the loans.

By the time of Peoples' insolvency in September, 1985, Community Federal had acquired servicing responsibilities for all the loans sold to Peoples, both those originating from Community Federal and those originating from Madison. As part of its servicing responsibilities, once a month Community Federal sent a "servicing report" to Peoples, as buyer, concerning each of the loans. The computer-generated report stated the name and loan number of each borrower, the outstanding principal balance of each loan as of the preceding month, the remittance made by each borrower in the current month, the current principal balance of each loan, and the amount of Community Federal's fee. The report was accompanied by Community Federal's check representing collections from borrowers, net of Community Federal's fee.

The Loan Participation Agreement between Rockland and Peoples was the result of one of many attempts by Peoples to solve its chronic undercapitalization problem. At a meeting on November 21, 1984, the Peoples' Board of Directors resolved to investigate the possibility of selling off part of the loan portfolio to bring the bank into compliance with the capital requirement. Leonard Slutsky, Peoples' former chairman, viewed the proposal as promoting capital compliance by reducing the bank's assets. He testified that he informally consulted the bank's outside auditor, Arthur W. Levine, to confirm that a sale of loans, even if sold with recourse to Peoples by the buyer in the event of a borrower's default, would be considered a sale of assets and would affect the bank's balance sheet accordingly. He testified that he received an affirmative response and reported his discussions with Levine to the other directors of the bank.[1]

**1.** Levine testified that he did not know of the transaction between Peoples and Rockland, that

In November, 1984, Peoples initiated discussions with Rockland for the purpose of "selling" loans having aggregate outstanding principal balances of approximately $4 million. In exchange for Rockland's check in the amount of $3,995,257.91, Peoples, in the language of the Loan Participation Agreement, "sold" and Rockland "purchased" an "80% interest" in 164 promissory notes evidencing consumer loans. The Loan Participation Agreement further provided:

3) Apart from the 80% participation interest in the principal for each Note referred to in Schedule A, participant shall earn thereon 13¼% per annum as net interest in this investment. Each sum received by Participant from Principal shall be applied first to interest then due under the various loans and balance thereof to amortization.

.      .      .      .      .

9) Principal shall hold the Note and all instruments now or hereafter representing the security given therefor ... and Principal shall collect and receive all amounts of principal, interest and any other sums that from time to time may be due under the provisions of said Note and Loan Documents. Principal shall remit immediately to Participant its pro rata share of all such sums according to Participant's interest and participation in the Loan.

.      .      .      .      .

12) Principal shall not, without the written consent of the Participant, (a) make or consent to any alteration of the terms of the Note; (b) undertake to release any of the collateral or security for the Loan; (c) accelerate or retard the maturity of said Note; (d) alter or amend the Loan Documents; (e) or waive any claim upon the Borrower or any guarantor in connection with the Loan.

.      .      .      .      .

14) If any Note or Notes is or are in default for 90 days or more Principal will immediately repurchase from Participant the latter's participating interest in the said Note(s) and pay Participant 80% of the then principal balance and interest at the rate of 13¼% up to date of said repurchase.

15) In conjunction with this transaction between Principal and Participant, and simultaneously with the execution and delivery of this participation agreement, Principal is establishing an account at Participant in the sum of $120,000.00 which account it hereby assigns unto Participant.

Contemporaneously with entry into the Loan Participation Agreement, Peoples issued a Participation Certificate for each participated loan, which incorporated the terms of the Loan Participation Agreement by reference and also certified that Rockland was "entitled to an undivided share or interest" in the principal and interest payable under each promissory note sold.

In addition to the Loan Participation Agreement, the parties entered into a written Loan Servicing Agreement, dated February 26, 1985, to "particularize" Peoples' servicing obligations. This agreement specified that Peoples' remittances were to be accompanied by a report showing the derivation of funds, and that Peoples was to "keep complete, accurate and separate records for each loan," that these records were to be made available to Rockland, and that Peoples was to account at least annually with respect to each loan. The agreement also reiterated Peoples' lack of authority, without Rockland's consent, to "waive, modify, release or consent to postponement of any borrower's obligation."

Rockland posted the transaction on January 4, 1985 as a debit to its general ledger "Personal Loans." On February 1, 1985, it transferred the transaction to a new account entitled "Personal Loans—Services by Peoples National Bank of Rockland County 80% Participation."

Peoples initially posted the transaction on January 4, 1985 to its general ledger as

---

to his knowledge his firm had not been called upon to review it, and that to his knowledge his firm did not advise Peoples concerning how the transaction should be recorded on its books and records.

a credit to a "Suspense Credit" account, the entry being described as "Proceeds fr[om] sale of Loans to S[avings] B[ank] of Rockland County." Later in January, representatives of the Office of the Comptroller of the Currency (the "OCC") informed Slutsky that since Peoples retained the risk of loss, Peoples could not treat the transaction as a sale of assets, but must re-book the transaction as a borrowing. Accordingly, the transaction was subsequently re-booked on January 31, 1985 by debiting the "Suspense Credit" account and crediting another general ledger account entitled "Other Borrowings."

Beginning in February, 1985, and continuing to September 4, 1985, slightly more than a week before Peoples was declared insolvent, Peoples made monthly remittances under the Loan Participation and Servicing Agreements by its own check, usually within five business days of the end of each month, consisting of Rockland's 80% share of principal and interest collections under the notes and additional amounts sufficient to provide Rockland's $13\frac{1}{4}\%$ return on investment. Each remittance was accompanied by a report showing the name of the borrower, the outstanding principal balance due to Rockland on each loan, the "mode" of payment (that is, monthly), and the date the next payment was due. Also during this period, and in response to Rockland's written request, Peoples repurchased Rockland's participation interest in seven defaulted notes for the total amount of $198,772.70. Rockland's August 7, 1985 letter request for the repurchase of five more defaulted loans for the total amount of $161,031.19 was never satisfied and remains outstanding.

Peoples was declared insolvent and closed by the OCC on September 13, 1985; on the same day, the OCC appointed the FDIC as receiver. On the date of insolvency, Peoples' records showed that $2,650,-777.82 was owing to Rockland with respect to the Loan Participation Agreement as of August 30, 1985. Pursuant to a court-approved sale of assets on September 13, 1985, the FDIC sold most of Peoples' assets to The First National Bank of Highland, but the sale did not include any of the loans covered by the Loan Participation Agreement.

By letter of December 4, 1985, the FDIC "disaffirmed" the Loan Participation Agreement. In its letter dated December 5, 1985, Rockland formally demanded of the FDIC all amounts due under the Loan Participation Agreement. Rockland submitted proofs of claim on January 16 and August 1, 1986, in the amount of $2,663,-287.33. The FDIC has conceded that the amount of $2,650,777.82 shown on Peoples' "Other Borrowings" account as a balance due to Rockland established, without need for further proof, Rockland's general creditor claim against the receivership entitling Rockland to a receiver's certificate. Therefore, the parties entered into a September 22, 1986 stipulation resolving, without prejudice, certain questions concerning the security account and providing for issuance to Rockland of receiver's certificate number 74, dated September 16, 1986, in the amount of $2,557,278.81.[2] Rockland has to date been paid one liquidation dividend thereunder, received on October 15, 1986.[3]

During the receivership, the FDIC has continued to receive monthly remittances of principal and interest from Community Federal on the loans covered by the Loan Participation Agreement. From September 13, 1985 through August 6, 1986, for instance, the FDIC received principal and interest payments on the participated loans totalling $1,049,294.

From September 13, 1985 to date, the FDIC has failed to make any remittances to Rockland of amounts due under the Loan Participation Agreement.

---

2. The FDIC computed this number by first adding accrued interest to the amount of $2,650,-777.83 shown on Peoples' books, for a total of $2,663,287.33. It then subtracted $106,008.52, the amount maintained by Peoples in an account at Rockland, to get a total of $2,557,-278.81.

3. The FDIC contends that the first dividend was $1,687,804.41, while Rockland asserts that it received only $1,601,266.01. This factual dispute cannot be resolved on the record before the court.

## Conclusions of Law

The material facts in this case are undisputed. The central issue is whether the transaction described by the Loan Participation Agreement was a purchase and sale, as Rockland contends, or was instead a loan by Rockland to Peoples, as Peoples' receiver, FDIC, contends. The parties agree that if the transaction is determined to be a purchase and sale, then Rockland is entitled to receive 80% of the proceeds of the loans as an 80% owner of the loans. On the other hand, if the transaction is determined to be a loan, then Rockland may be relegated to general creditor status and may only share *pro rata* in the proceeds of the receivership. Alternatively, the proceeds of the loan may be determined to be held in trust for Rockland, thus creating a preference for Rockland over the general creditors.

## Purchase and Sale or Loan

■ The FDIC does not contest the proposition that a valid loan participation creates an ownership interest in the participant, in this case Rockland. *See FDIC v. Mademoiselle of California,* 379 F.2d 660, 664 (9th Cir.1967); *InterFirst Bank Abilene, N.A. v. FDIC,* 590 F.Supp. 1196 (W.D. Texas 1984), *aff'd,* 777 F.2d 1092 (5th Cir. 1985); *see also In re Columbia Pacific Mortgage, Inc.,* 20 B.R. 259 (Bankr.W.D. Wash.1984) (in bankruptcy, participant's interest in secondary mortgage market loans held not to be part of debtor's estate). The FDIC contends, however, that the transaction at issue here is not a valid loan participation, but a loan "disguised" as a loan participation.

The cases that address whether or not certain transactions are to be considered loans or sales do not lay down a clear rule of law on the issue, and the parties here most certainly do not agree on a governing principle. The language of the Loan Participation Agreement and testimony of Rockland's president and Peoples' former chairman establish that the parties to the Loan Participation Agreement intended that the transaction be a sale of assets. However, the parties have cited no cases stating that the intent of the parties dictates whether a transaction is to be characterized as a sale or loan in distributing the assets of a receivership. At the same time, the FDIC relies in part on the OCC's determination, after examining Peoples' books and the loan documents, that this transaction should be recorded as a loan on Peoples' books. Because there is little case law and the case affects a field important to the nation's economic health, this court must exercise its equitable powers seeking fairness to all those concerned—Rockland, other creditors, and the public at large.

The authority most nearly on point is *In re S.O.A.W. Enterprises, Inc.,* 32 B.R. 279 (Bankr.W.D.Texas 1983), which addresses the question of how to characterize a participation in the context of bankruptcy. S.O.A.W. purchased land which it subdivided into smaller parcels and sold pursuant to real estate sale contracts known as "Agreements for Deed." In order to generate capital, S.O.A.W. sold a 30% participation in the Agreements to Deed to Castle Rock Industrial Bank. Castle Rock took possession of the various "participated" Agreements for Deed. When S.O.A.W. filed for bankruptcy, Castle Rock sued to compel S.O.A.W. to continue to remit the funds required by the participation agreement. S.O.A.W. defended on the ground that the agreement was not a true participation, but a disguised loan. In holding that the transaction was a loan, the court relied, *inter alia,* on the fact that under the agreement, Castle Rock received a greater rate of repayment and return than S.O.A.W. received under the Agreements for Deed:

> The rate of repayment and the return provided for Castle Rock are incompatible with the concept of participation, and more compatible to that of a loan and a debtor/creditor relationship.

*Id.* at 282. The court also relied on the fact that Castle Rock bore no risk of loss in the transactions.

> The Court also finds that this transaction was structured so that Castle Rock ran no real risk. A "participant" in a loan normally assumes the same risk as that of the person selling the participation or generating the loan. In this transaction,

the evidence showed that both S.O.A.W. and its President, Warren Wimberly, personally guaranteed the return to Castle Rock of its investment and guaranteed the interest to be generated by investment. Thus, Castle Rock "participated" in no risk of non-payment by the Agreement for Deed vendees because it did not look to them to repayment.

*Id.* at 282–83. Thus, in *S.O.A.W.,* the Bankruptcy Court applied an objective test, taking into account the above factors, and concluded that the transaction was a loan. Although Castle Rock held the Agreements to Deed as security, the loans were determined to be unsecured because of Castle Rock's failure to properly perfect its security interest by filing.

A second line of cases directs recovery for the claimant when the transaction at issue creates a trust for the benefit of the claimant. In *Stratford Financial Corp. v. Finex Corp.,* 367 F.2d 569 (2d Cir.1966), the Second Circuit had before it a transaction analogous to the one at issue here. Stratford loaned $50,000 to Seefeld Hermanos, S.A., evidenced by ten notes of $5,000 each. Stratford entered into a letter agreement with Finex purportedly transferring an interest in the notes in return for $40,000. Stratford filed for bankruptcy after receiving some payments on the notes and thereafter received $25,000 from Seefeld, which Stratford endorsed over to Finex. Stratford's creditors' committee sought return of the $25,000.

The letter agreement provided that Finex was to immediately turn over to Stratford $40,000 in return for a 100% interest in the first eight notes. Payment of principal was to be made within five days after payment was made by the borrowers, except that Finex would be paid $7,000 within five days of the first $5,000 note's maturity, and only $3,000 on the last note's due date. The letter also guaranteed full repayment of the notes and, "as compensation to you for your advance," provided for 15% interest on the cash balance after five months. The letter further provided:

> The loan shall be conducted solely in our name.... However, we shall hold all notes pertaining to this transaction "in trust" for our mutual benefit.

The debtor argued that the words "in trust" were not dispositive and that the following required reversal of the finding that there was a trust: Stratford's promise to pay interest, its guarantee of payment of principal, its failure to segregate the notes, and Stratford's commingling in its general checking account payments it received on the notes prior to bankruptcy.

In concluding that a trust relationship existed, the Court looked only at "the intention of the parties, which if not clearly indicated by the language of the parties, is to be inferred from all the circumstances." *Id.* at 571 (citing 1 Scott, Trusts § 12.2 (2d ed. 1956)). In determining the parties' intent, the Court relied not only on the language of the letter agreement but on the fact that Stratford had promised to keep the notes "separately from any unsecured deals," and that, even though Stratford was in financial difficulty, it always remitted the proceeds of the checks promptly to Finex and never used the remaining notes for its own purposes. *Id.*

At odds with *Stratford* is *Federal Home Loan Mortgage Corp. v. FDIC,* No. 85–39 (E.D.Ky.1985) [hereinafter *FHLMC*], a case which has facts similar to those present here and which addresses specifically the question whether funds transferred to a bank must be segregated and kept as a special fund in order to become a trust fund. Prior to its insolvency, Sparta-Sanders State Bank entered into contracts with FHLMC whereby it agreed to sell mortgages to FHLMC and to service the mortgages. As servicer, Sparta-Sanders collected the monthly principal and interest payments from the mortgagors and deposited the funds into Custodial account # 9. As some mortgages were only owned in part by FHLMC, some of the funds in the account belonged to Sparta-Sanders. On the 25th day of each month, the account was debited in an amount equal to FHLMC's share of principal and interest, and the sum was transferred to a separate custodial account for remittance to FHLMC.

After Sparta-Sanders failed and the FDIC was appointed receiver, FHLMC sued to recover the funds from Account # 9 on the theory that they were not part of the estate administered by FDIC as receiver. On cross-motions for summary judgment, the court found that the parties lacked the necessary intent to create a trust, relying heavily on the "unfettered right to temporary control and use of the funds." The court thus held that the deposited fund was not a trust fund, since it was not a special, as distinguished from a general, deposit, and there was no intention expressed or clearly implied that the funds should be segregated and not commingled with the bank's general funds. *See also Keyes v. Paducah & I.R. Co.*, 61 F.2d 611, 613 (6th Cir.1932).

Under the analysis set forth in *S.O.A.W.*, the transaction evidenced by the Loan Participation Agreement is not a "purchase and sale" but a "loan."[4] In the present case, Rockland admittedly has no risk of loss and is paid a sum by Peoples over and above the principal and interest received by Peoples on the deal. Nevertheless, this court is neither constrained to follow the Bankruptcy Court's decision nor constrained to deny Rockland relief even if this transaction is properly characterized as a loan. With the equitable powers exercised by the Court in *Stratford* as a guide, this court is compelled to look at other factors. First of all, the parties intended this transaction to be a purchase and sale, drafting the documents using such language and later testifying to their intent. As a purchase and sale rather than an unsecured loan, the transaction lent to Rockland security against a possible default by Peoples. Under the FDIC reasoning, Rockland would be a general creditor like the others, despite the intent of Rockland and Peoples to actually transfer an interest in the underlying notes.

As in *Stratford*, the intent to set aside for Rockland the payments received from Community Federal is clear. Although there is no "trust" language in the Agreement, the parties believed that an 80% interest in the notes belonged to Rockland and that Rockland had an ownership right in the proceeds. The provision that Peoples "shall remit immediately" to Rockland its share of the proceeds and keep separate records for each loan,[5] to be made available to Rockland, as well as Rockland's performance in remitting the proceeds of the notes promptly, as in *Stratford*, establish that the parties intended that the proceeds be held for Rockland.

Furthermore, the FDIC's characterization as sales of its own loan participation agreements, which, just like the Rockland/Peoples Loan Participation Agreement, involve no risk of loss and an interest rate higher than that of the underlying loans, undercuts its argument with respect to this transaction. The FDIC's New York consolidated field office has an "asset marketing section" which sells packages of loans inherited by the FDIC from banks in receivership. These sales are accomplished pursuant to a "buy/sale agreement" drawn up for each transaction with the assistance of the legal staff. A form of the FDIC "Loan Sale Agreement" provides for a "required yield" and contains a repurchase provision essentially identical to the one in Rockland's Loan Participation Agreement.

Although Rockland's claim of estoppel at the FDIC's differing positions on like transactions is unfounded, since Rockland has shown no detrimental reliance, the FDIC's change of position because other parties' agreements are at issue pricks the conscience of the court. The FDIC's attempts to differentiate between its participation agreements and that of Rockland and Peoples are disingenuous. It distinguishes its "buy-back" provisions on the grounds that the FDIC must retain the risk of loss in certain instances, to keep from endangering a healthy bank by selling it loans that later might have to be "charged-off."

---

4. Of course, had Castle Rock in *S.O.A.W.*, properly perfected its security interest by filing, the loan would have been fully secured by the Agreements to Deed, a result impossible under the FDIC's theory in this case.

5. Rockland states in its brief that the Servicing Agreement requires segregation of payments. It does not.

While this may well be true, it does not explain why the transactions are characterized as sales rather than loans. The FDIC distinguishes its "required yield" from the 13.25% interest rate which Rockland received by alleging that the FDIC's "required yield" connotes the "mathematical formula applied so that the purchase price of the loan package reflects prevailing interest rates at the time of the sale." While the FDIC argues that Rockland's 13.25% yield "had nothing to do with such a calculation," it is only logical that the 13.25% was derived by some estimation of present day interest rates. Again, the difference pointed to by the FDIC has little to do with whether the transaction should be characterized as a purchase or sale. While the FDIC's hackles are raised by any analogies between the FDIC, which "does not attempt to make a profit on a Loan Sale," and Rockland, which does, the difference between the two entities' functions does not explain why similar transactions entered into by the two are to be characterized as sales in one case and loans in the other.

Furthermore, soon after the Loan Participation Agreement was entered into, the FDIC reviewed it and characterized it as a purchase of loans. After examination of Rockland's books on February 19 and July 1, 1985, FDIC examiner Gregory P. Wyka, in his reports of visitations, described the asset purchase in detail and, while questioning its value to Rockland, nowhere characterized the transaction as a loan. The transaction was characterized as "the bank's recent purchase of participating interests in personal loans held by [Peoples]" and as "purchased loan participations."

Moreover, the FDIC's position that this is merely a loan does not account for the role of the notes in the transaction. Surely the specification of the proceeds of the promissory notes as belonging to Rockland creates some sort of a security interest in Rockland, making Rockland at least a secured creditor. The FDIC, in insisting that Rockland is a general (and unsecured) creditor, has not proposed a function that the notes might possibly serve.

On the other side of the balance, the FDIC points to the OCC's independent determination, based on an examination of Peoples' books and the loan documents, that the transaction must be recorded as a loan rather than a sale. Even if Rockland's claim for a preference depended on a finding that the transaction was a purchase, the OCC's conclusions are not determinative. While the OCC's determination dictates how Peoples was to carry the transaction on its books while it was still an operating enterprise, it is less authoritative in determining how to divide up the assets of the now insolvent bank. The OCC's mandate was most likely aimed at properly characterizing the risk involved with the transaction, classifying the transaction in the way that would best reflect the actual health of the bank. The present determination is concerned not with risk but with the equitable division to all claimants of the assets of a defunct bank. Thus, other considerations, such as the intent of the parties, are relevant. The OCC did not, at least on this record, inquire to any extent into the intent of the parties in entering this transaction.

Neither the Loan Participation Agreement nor the Service Agreement segregated the moneys that were paid to Peoples by Community Federal. Instead, Peoples was entitled to commingle the payments with other income until payments were actually made to Rockland. While *FHLMC* suggests that this may be fatal to a claim that the moneys constitute a trust fund, this Circuit has determined that it is not. *See Stratford, supra,* 367 F.2d 569, *see also Union Electric Light & Power Co. v. Cherokee Nat'l Bank,* 94 F.2d 517, 520 (8th Cir.1938); *Seattle First Nat'l Bank v. FDIC,* 619 F.Supp. 1351 (W.D.Okla.1985). In addition, the circumstances in *FHLMC* shed a different light on the outcome there. The failed bank was not continuing to receive payments from the mortgagors and denying FHLMC the proceeds. The only fund at issue was the amount remaining in Custodial Account # 9 at the time of insolvency, so a larger and easily identifiable fund was not continuously being aggregated over the course of the lawsuit. The

Court also relied on the fact that FHLMC and not Sparta-Sanders had the ownership interest in the mortgages bought from Sparta-Sanders. This is inconsistent with the Ninth Circuit's reasoning in *Mademoiselle* and adopted here that the title owner of note payments is entitled to a preferred claim in the amount of the payment when the bank holding the note becomes insolvent. *See Mademoiselle*, 379 F.2d at 665.

Rockland faults the FDIC for failing to acknowledge that augmentation of Peoples' assets by its receipt of note payments is sufficient grounds in itself for imposing a trust on the funds collected. *See e.g., Jennings v. United States Fidelity & Guaranty Co.*, 294 U.S. 216, 222, 55 S.Ct. 394, 396–97, 79 L.Ed. 869 (1935) ("If the money had been paid over the counter with the understanding that it was accepted as a special deposit ..., the doctrine of a continuing trust would charge the agent with a duty to set the proceeds of collection apart from other assets, and hold them intact for transmission to the forwarder"), *quoted in FDIC v. Mademoiselle of California*, 379 F.2d 660, 666 (9th Cir.1967); *see also Chase Manhattan Bank, N.A. v. FDIC*, 554 F.Supp. 251, 254 (W.D.Okla. 1983). The cases it cites, however, do not support this statement. While augmentation is necessary to a claim for preference, it is not sufficient. *See Seattle-First Nat'l Bank v. FDIC*, 619 F.Supp. 1351, 1360–61 (W.D.Okla.1985). Nevertheless, Rockland has shown more than a mere augmentation of Peoples' assets; it has demonstrated through the participation documents and testimony the intent of the parties to treat this "deposit" specially.

Although non-binding authority weighs against determining that the transaction at issue here was a purchase and sale, on equitable grounds a distribution from the receivership estate in priority to the general creditors will be awarded in the amount of all collections previously withheld on 80% of the loans as well as 80% of future loan collections. Because the FDIC improperly withheld the amounts due on the mistaken notion that Rockland's 80% share of collections of principal and interest became assets of Peoples' receivership estate, Rockland is entitled to prejudgment interest, as of the date the payments were due from Peoples. A preference is equitable in these circumstances due to the parties' unequivocal intentions to enter into a purchase and sale transaction, the FDIC's own characterization of similar transactions entered into by it as purchases and sales, the FDIC's change in position on this very transaction, and the identifiability of a specific fund in Peoples' possession that equity recognizes as rightfully belonging to Rockland.

### Contractual Obligations of FDIC

The Loan Participation Agreement is part conveyance and part contract. As a conveyance, it transferred 80% of what had been Peoples' 100% ownership interest in the notes. As a contract, it recorded Peoples' promises, two of which are relevant here: (1) Peoples' promise to repurchase Rockland's interest in loans in default for 90 days or more, and (2) Peoples' promise to make monthly remittances, apart from Rockland's 80% share of principal and interest collections under the notes, in amounts sufficient for Rockland to earn 13¼% annual interest. In return for these promises, Rockland transferred nearly $4 million to Peoples.

The FDIC purports to have "disaffirmed" the Loan Participation Agreement. That disaffirmance apparently does not concern the 80% interest in the principal and interests of the underlying notes, since the FDIC is willing to concede a general creditor's claim with respect to that amount. Instead, the disaffirmance would seem to be directed at the promises to repurchase and pay 13¼% interest. Rockland contends that this "disaffirmance" is a breach of the contractual provisions. It also argues that, even before the FDIC's involvement, Peoples breached the repurchase promise by failing to comply with Rockland's August 7, 1985 request for the repurchase of Rockland's interest in five specific loans, whose outstanding principal balances amounted to $161,031.19.

As an initial matter, Peoples' failure to comply, before it was declared insolvent,

with Rockland's August 7, 1985 request for the repurchase of Rockland's interest in five specific loans is certainly a breach of the Loan Participation Agreement. Since the FDIC has not set forth a meritorious defense to that claim of breach, asserting only that the OCC's direction to Peoples to book the transaction as a loan somehow "voided" the sale, and since the declaration of insolvency was not a cause of that breach, Rockland is entitled as a general creditor for its damages resulting from Peoples' breach. *See First Empire Bank v. FDIC,* 572 F.2d 1361, 1368–69 (9th Cir. 1978) (claim against the receiver of an insolvent national bank is valid if it furnishes a present cause of action at the commencement of receivership proceedings), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

Rockland contends that the FDIC's "disaffirmance" of the Loan Participation Agreement constitutes a breach of the provisions for 13¼% interest on Rockland's investment and for repurchase of any defaulted loans. The issue raised by this claim is whether the FDIC has the power to disaffirm these contractual provisions and refuse to perform them.

The FDIC cites *Butterworth v. Degnon Constr. Co.,* 208 F. 381 (S.D.N.Y.1914), *aff'd,* 214 F. 772 (2d Cir.1914), for the proposition that a receiver may disaffirm executory contracts. The Court in *Butterworth* stated:

> No one doubts that a receiver is not saddled with the contract of his insolvent or bankrupt, except by choice, nor that he can take a reasonable time for investigation before choosing.

*Id.* at 382. The Court in *Butterworth,* however, did not address a contract such as this, where the other party had fully executed its obligations and only the receiver had yet to perform under the contract. Furthermore, the court denied the receiver the value of any services rendered by the insolvent after insolvency, in large part because the defendant had proved damages growing out of nonperformance of the contract far exceeding the worth at contract prices of the services rendered. The Court,

in resolving the issue, resorted to "equitable principles, by which the rights and duties of receivers are governed," concluding that "here ... equity means especially justice and common sense." *Id.* at 382.

Therefore, *Butterworth* does not compel this court to find that the FDIC could disaffirm the Loan Participation Agreement regardless of any damage thereby caused to Rockland. Other cases, in fact, suggest that Rockland has a valid claim against the receiver as long as it meets the requirements for a claim "provable" against the receiver of an insolvent national bank. These requirements are:

> (a) The claim must furnish a present cause of action at the commencement of receivership proceedings; or
>
> (b) The claim, at the commencement of proceedings, must be certain, even if not matured, and must not depend on new contractual obligations arising later; or
>
> (c) The claim, if contingent, must have a worth or amount "that can be determined by recognized methods of computation at a time consistent with the expeditious settlement of estates."

*First Empire Bank v. FDIC,* 572 F.2d 1361, 1367–69 (9th Cir.1978) (quoting *Penn Steel Co. v. New York City Ry Co.,* 198 F. 721, 739–40 (2d Cir.1912)).

Rockland's contract-based claim meets these requirements. Both aspects of the claim, namely, breach of the monthly interest and immediate repurchase obligations, were contained in an enforceable written agreement, the Loan Participation Agreement. To the extent that the continuing nature of Peoples' obligations makes Rockland's claims uncertain in amount, the value of both aspects of the claim appears capable of being determined by recognized methods of computation. Because Rockland's general creditor claim meets the requirements of provability, Rockland's claim will be allowed, to be paid *pro rata* from the assets of the receivership estate.

*The $100,000 Deposit at Rockland*

Rockland has moved pursuant to Rule 60(b), Fed.R.Civ.P., for relief from this court's January 27, 1987 opinion denying it summary judgment on the issue of whether

the amount of the receiver's certificate issued to Rockland should be augmented by the $100,000 deposit of Peoples at Rockland, allegedly held as security for performance of Peoples' obligations under the Loan Participation Agreement. Rockland renews its motion on the ground of newly discovered evidence.

■ The January 27 opinion held that an issue of fact remained as to whether the $100,000 deposit at Rockland was collateral for Peoples' debt to Rockland. If in fact it were collateral, Rockland would not be required to reduce the amount of its claim against the FDIC. *See Merrill v. National Bank of Jacksonville*, 173 U.S. 131, 146, 19 S.Ct. 360, 366–67, 43 L.Ed. 640 (1899). In support of its claim, Rockland showed only that the Loan Participation Agreement provided for a simultaneous deposit at Rockland in the sum of $120,000 and that Peoples deposited $100,000 into a Rockland account over a month later.

After the opinion was issued, Rockland deposed the former chairman of Peoples' board of directors, who testified that the $100,000 was deposited at Rockland in accordance with the requirements of the Loan Participation Agreement, that the purpose of the deposit was to guarantee "that the loans would be good" in view of the fact that they were being sold with recourse, and that the difference between the amount deposited and the amount required to be deposited related to the insurance limits on deposits in savings institutions. In addition, the FDIC deposed Rockland's acting president, who testified that there was "no question" in his mind that Peoples' deposit was made in fulfillment of ¶ 15 of the Agreement in order to "insure compliance with the repurchase agreement in the event of a defaulted note." He further testified that Rockland does not maintain deposits of other commercial banks and never has.

Rockland has also presented to the court, by letter dated May 29, 1987, a FDIC Report of Visitation of Rockland which states:

> Although the agreement specifically set forth that PNB "simultaneously" open at [sic] account at the subject bank in the amount of $120,000, such was actually not effected until 2/11/85, some 38 days after the transaction, and was opened in the reduced amount of $100,000, ostensibly for FDIC insurance purposes. The reasons given for the delay was [sic] that the appropriate party at PNB was on vacation in Mexico.

A second visitation report shows that the FDIC examiner questioned Rockland for not resorting to the $100,000 to enforce certain repurchase obligations of Peoples.[6]

In opposition to this motion, the FDIC contends that the actual practice of Rockland with respect to the $100,000 deposit is inconsistent with the position that the deposit is collateral for the Loan Participation Agreement. In particular, the FDIC notes that when Rockland's August 7 demand for repurchase of the defaulted loans went unanswered by Peoples, Rockland did not debit this account. The FDIC also cites testimony from the former president of Peoples that the account was opened as a "compensating balance" and not as security for the transaction. Since the $100,000 deposit is not collateral, the FDIC argues, it should be set off against the debt of Peoples.

From the facts as stated, Rockland is entitled to relief from the prior opinion and to summary judgment on this issue. The testimony of the Rockland and Peoples' representatives, as well as the FDIC Report of Visitation, conclusively establishes that the $100,000 was deposited in connection with the Loan Participation Agreement, as required in ¶ 15. The failure of Rockland to debit the account after its demand for repurchase does not refute that conclusion, given the closing of Peoples just five weeks later, on September 13, 1985. Thereafter, Rockland could not be expected to debit the account in the face of possible claims by the FDIC.

---

6. The FDIC has objected to this report as inadmissible, since it was produced by the FDIC, Division of Bank Supervision, which is not a party to this action, and since the Report is hearsay. The Report, however, falls within Federal Rule of Evidence 803(6), and will be considered by the court.

The FDIC relies heavily on *D'Oench Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), in arguing that any oral modification of ¶ 15 so as to require not a $120,000 deposit but a $100,-000 one is inadmissible, since the FDIC is protected from oral side agreements which diminish or defeat its interests in the assets of a closed bank. Even if this rule is as broad-sweeping as the FDIC claims it is, the rule is not applicable here. The direct result of Peoples' deposit of $100,000, rather than the $120,000 required by the Agreement, was to actually increase rather than diminished the assets of Peoples. The only "diminution of assets" is indirect: By using this "oral agreement" to demonstrate the connection between the deposit and the Loan Participation Agreement, Rockland will be able to keep the $100,000 against any debt owed by Peoples to Rockland as a general creditor. Furthermore, there was no actual "oral agreement." Instead, the Agreement was not performed in accordance with its strict terms, and this appears to have been tolerated by both parties. More importantly, a determination of the circumstances surrounding the change from a $120,000 to a $100,000 deposit are not essential to a determination of whether this was collateral. The evidence establishes that the deposit was made because the Loan Participation Agreement required a deposit. Whether or not the required deposit was at some point lowered, the fact remains that no other reason existed for a deposit to be made by Peoples at Rockland. Thus, even without testimony on why the amount was less than required in the Agreement, it appears that the $100,000 deposit was made pursuant to the Agreement.

Furthermore, this court does not interpret the *D'Oench* doctrine as broadly as the FDIC. In *D'Oench*, the plaintiff had sold the bank some bonds that went into default. The bank did not want to show the bonds on its books as in default, so *D'Oench* executed notes to the bank to "cover" the bonds and allow the bank not to show the bonds as in default. The bank and D'Oench had a "side agreement" that D'Oench would not have to repay the loan. The effect of this arrangement was to over-state the bank's assets. When the bank failed, FDIC sought to collect on the notes. D'Oench raised the defense of no consideration for the notes, since he was not loaned any money. He also argued that he did not mean to mislead banking regulators and that no one had been harmed by the arrangement.

The Supreme Court held that the FDIC as receiver could avoid the defense, regardless of whether D'Oench intended to mislead FDIC because D'Oench had "lent himself" to the bank's effort to mislead banking authorities. The Court concluded that, regardless of his actual intent, D'Oench was "chargeable" with knowledge that he was "aiding the bank to conceal the actual transaction," and that, although the FDIC did not insure the bank until after the notes were given, the misleading arrangement between D'Oench and the bank was "a continuing one." The Court concluded that, while D'Oench "was not a participant in this particular transaction and, so far as appears, was ignorant of it, ... [D'Oench] was responsible for the creation of the false status of the note in the hands of the bank." 315 U.S. at 461. The Court went on to hold that whether creditors were actually deceived or injured was "irrelevant."

Unlike *D'Oench*, this case does not involve an active misrepresentation or fraud committed by way of secret agreements not recorded on the books of the defaulting bank, and intended to deceive the bank's creditors, state banking representatives, and the FDIC. The cases outside this Circuit cited by the FDIC, to the extent, if any, that they broaden the *D'Oench* doctrine to reach a case such as this, will not be followed.

Thus, the FDIC is directed to issue a receiver's certificate undiminished by the amount contained in the Peoples account at Rockland, in addition to remitting Rockland's 80% share in the loan collections. Judgment will be submitted on notice.

IT IS SO ORDERED.