In re OKURA & CO. (AMERICA), INC., Debtor.

No. 98–B–46032 JHG.

United States Bankruptcy Court, S.D. New York.

June 15, 2000.

Kronish, Lieb, Weiner & Hellman LLP, New York City, by James A. Beldner, Ronald Sussman, for the debtor.

Dewey Ballentine, LLP, New York City, by Stuart Hirshfield, Sandor E. Schick, for the Liquidating Trustee.

White & Case, LLP, New York City, by Philip H. Schaeffer, Andrew P. DeNatale, David G. Hille, for The Bank of Tokyo–Mistusbishi, Ltd.

## MEMORANDUM DECISION GRANTING THE LIQUIDATING TRUSTEE'S MOTION TO REDUCE THE CLAIM OF THE BANK OF TOKYO–MITSUBISHI, LTD. (CLAIM NUMBER 150)

JEFFRY H. GALLET, Bankruptcy Judge.

## I. INTRODUCTION

The Liquidating Trustee (the "Trustee"), appointed pursuant to the First Amended Joint Plan of Liquidation of Okura & Co. (America), Inc. moves,[1] pursuant to § 502(b) of the United States Bankruptcy Code (the "Code") and Federal Rule of Bankruptcy Procedure 3007, to reduce claim number 150 filed by The Bank of Tokyo–Mitsubishi, Ltd. ("BTM").[2] The Trustee contends that the portion of BTM's claim which is based upon BTM's participation in a loan from Fuji Bank, Limited ("Fuji") to Okura & Co. (America), Inc. (the "Debtor") should be disallowed because it is based upon a claim which cannot be asserted against the estate.

For the reasons set forth below, the Liquidating Trustee's motion is **GRANTED.**

## II. BACKGROUND

The facts are not in dispute. On January 24, 1990, Fuji entered into a letter of credit agreement (the "LCA") with the Debtor in order to allow the Debtor to create a $50 million commercial paper program. The LCA provides that Fuji would issue certain irrevocable letters of credit for the account of the Debtor in order to support commercial paper which the Debtor would issue. The LCA also sets limits as to minimum dollar amounts of individual letters as well as a maximum amount that Fuji would honor. Only Fuji and the Debtor were signatories to the LCA.

On the same day, Fuji and BTM entered into a participation agreement (the "Par-

---

1. Although the motion was jointly filed by the Debtor and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), on the effective date of the First Amended Joint Plan of Liquidation (the "Plan"), December 8, 1999, (i) all property of the Debtor's estate was transferred to the liquidating trust (*see* Plan at § IV.C), and (ii) the Liquidating Trustee was given the right to file objections to claims (*see* Plan at § VI.B). Since the Liquidating Trustee was the proper party to bring this motion and is represented by the same law firm that represented the Creditors' Committee prior to the effective date, the motion is being treated as if it were filed by the Liquidating Trustee instead of jointly by the Debtor and the Creditors' Committee.

2. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

ticipation Agreement") under which Fuji agreed to sell, and BTM to buy, an "undivided interest and participation to the extent of 22.5% (your 'Percentage Share') in and to the Letters of Credit and the obligations of the [Debtor] in respect of the Letters of Credit and under the Letter of Credit Agreement...." Participation Agreement at 1.

The Participation Agreement further provides that Fuji reserves

the right, in its sole discretion, in each instance, without prior notice to [BTM], to agree to the amendment modification or waiver of any or all of the terms of the Letter of Credit Agreement, the Depository Agreement, the Letters of Credit or any agreement or document related thereto, to consent to any action or failure to act by [the Debtor] or any other party, and to exercise or refrain from exercising any powers or rights which we may have under or in respect of the Letter of Credit Agreement, the Depository Agreement, the Letters of Credit or any agreement or document related thereto or any collateral therefore, including, without limitation, the right to enforce the obligations of [the Debtor] or any other party, except that we shall not, without your prior written consent approve any amendment to, modification of or waiver of the Letter of Credit Agreement, the Depository Agreement, the Letters of Credit or any agreement or document related thereto which would (i) alter the time or times for payment of the principal of or interest on any reimbursement or repayment obligation under the Letter of Credit Agreement, the principal amount thereof, or the rates of interest thereon; nor (ii) reduce the Letter of Credit Fee payable under Section 2.07 of the Letter of Credit agreement.... Notwithstanding anything otherwise contained herein, we may at any time in our sole discretion increase the Bank Letter of Credit Commitment; provided that you shall not be under any obligation to increase your liability to purchase participations hereunder due to such increase in the Bank Letter of Credit Commitment.

Participation Agreement at ¶ 10 (emphasis added except for the word "provided" which is underscored in the original).

Other significant provisions of the Participation Agreement include paragraph 11 (which requires BTM to reimburse Fuji for its percentage share of any costs which Fuji incurs in connection with the collection or enforcement of the Debtor's obligations under the LCA); paragraph 14 (which provides that BTM may not subdivide or transfer all or part of its interest in the LCA without Fuji's prior written consent); and paragraphs 2, 4(a), 4(b), 4(c), 12, 13 and 14 (all of which, with the exception of paragraph 14, exclusively provide for payments to flow from the Debtor to Fuji and from Fuji to BTM). The Debtor was not a party to the Participation Agreement.

On Aug. 21, 1998, the Debtor filed a voluntary petition for relief under Chapter 11 of the Code. On the petition date, it owed $15 million to Fuji under the LCA. The Debtor listed this indebtedness on its schedules of assets and liabilities filed with the Court. Fuji filed a proof of claim regarding the letters of credit underwriting the Debtor's commercial paper program in the amount of $15 million. This amount includes BTM's 22.5 percent participation interest in the Debtor's indebtedness to Fuji. Finally, BTM's proof of claim includes an entry for $3,375,000 characterized as "Participation to L/C regarding C/P." Thus, Fuji and BTM each filed a proof of claim for BTM's participation in the LCA.

### III. SIGNIFICANCE OF THIS MOTION

The genesis of this dispute is somewhat unusual. During the course of this case, but prior to confirmation, the Debtor sued BTM regarding matters unrelated to this motion. The suit was settled and one of the terms of the settlement relates directly

to this matter. The parties agreed that if BTM is allowed to file a separate claim for its participation interest in the LCA, then 40 percent of that claim will be paid in full while the remaining 60 percent will receive the same treatment as all other unsecured creditors.

On the other hand, if BTM is not allowed to file its own claim, it will be paid 22.5 percent of any recovery that Fuji receives on account of its LCA claim. That claim is a general unsecured claim. At the time that this motion was argued, the attorney for the Trustee estimated that general unsecured creditors would receive a distribution of about 30 percent of the allowed amount of their claims. The significance of this motion, to the parties, is the difference between the treatment that BTM is entitled to receive under the settlement stipulation, if its claim is allowed, and the treatment that the same claim would receive as a general unsecured claim, about $950,000.[3] However, the treatment of loan participation agreements by Bankruptcy Courts is of general importance in the commercial world.

## IV. EXTRINSIC MATERIAL

With its opposition papers, BTM submitted several additional documents which it argues I should consider (collectively, the "Extrinsic Materials"). These are: 1) an affidavit of Akira Takeuchi, Vice President of BTM; 2) an alleged credit application, covering September 1, 1997 to August 31, 1998, from Okura & Co. Ltd. ("Okura–Japan"), the parent company of the Debtor, to BTM's head office in Tokyo listing all of the Debtor's obligations to BTM which includes an entry for $11.25 million (the maximum amount of BTM's potential exposure on the $50 million LCA); 3) a guarantee running from Okura–Japan to BTM in which Okura–Japan purportedly

agrees to guarantee all of the Debtor's obligations to BTM outlined in the credit application (including the $11.25 million potential exposure); and 4) a letter from Okura–Japan to BTM's head office in Japan "acknowledging" that its American subsidiary has a series of credit facilities outstanding, including the $11.25 million potential exposure under the Participation Agreement, and requesting that BTM renew these facilities for another year.

The Trustee opposes my consideration of the Extrinsic Materials on the grounds that my consideration of it is precluded by the parol evidence rule because the contract at issue is unambiguous and that the Extrinsic Materials are not relevant to the question before me.[4]

## V. DISCUSSION

The Trustee argues that the claim asserted by BTM for $3,375,000, based on Okura's obligations under the LCA, should be disallowed and that BTM should only receive a pro-rata share of any distribution to Fuji as lead lender. The Trustee maintains that the LCA, the Participation Agreement, and the case law regarding participation agreements do not support BTM's assertion that it may assert a claim directly against the Debtor because BTM is not a creditor of the Debtor.

In opposition, BTM makes five arguments. First, BTM argues that it is entitled to file a claim because of the broad definition given to the words "creditor" and "claim" under the Bankruptcy Code. *See* 11 U.S.C. §§ 101(5) and 101(10) (2000). Next, it contends that there is binding Supreme Court and Court of Appeals of the Second Circuit precedent on point which I am constrained to follow. *See Small Business Admin. v. McClellan,* 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200

---

**3.** Fuji agreed to reduce its claim by $3.375 million or 22.5 percent in the event that BTM was successful in its opposition to the Trustee's motion and is allowed to file a separate proof of claim for its participation interest.

**4.** The agreement between BTM and Okura–Japan is not before me and this opinion should not be considered a determination of any issues between BTM and Okura–Japan, a separate and distinct entity from the Debtor.

(1960); *In re The Westover, Inc.*, 82 F.2d 177 (2d Cir.1936). Third, BTM claims that it is a tenant-in-common in the LCA with Fuji, and, therefore, has a right to assert a claim directly against the Debtor. Fourth, BTM maintains that the way it and Fuji were required to treat the LCA and the Participation Agreement in their books, pursuant to prevailing federal banking laws, supports the conclusion that the Participation Agreement affected a partial assignment and complete divestiture of the participated portion of the LCA to BTM from Fuji. Finally, BTM asserts that I should consider the Extrinsic Materials which, it contends, demonstrates the parties' relationship during the time that BTM and Fuji executed the Participation Agreement and also the intent of the parties at that time. It should be noted at the outset, however, that BTM does not contend that the Participation Agreement is ambiguous.

I will examine each of these arguments in turn.

### A. *Analysis of the Definitions of "Claim" and "Creditor" in the Bankruptcy Code*

The first question is whether BTM is entitled to file a proof of claim for its participation interest in the LCA based upon the expansive definitions of the words "claim" and "creditor" under the Bankruptcy Code. The Bankruptcy Code defines the term "claim" as:

> a right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5)(A) (2000).

A "creditor" is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A) (2000). If BTM's participation interest qualifies as a claim against the estate of the Debtor that arose prior to the date that the Debtor filed its voluntary petition, then it is a creditor of the Debtor. *See* 11 U.S.C § 301 (2000).

■■■ The word "claim" is interpreted broadly under the Bankruptcy Code. *See Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir.1997) ("courts have characterized the term 'claim' as, *inter alia*, 'broad,' 'very broad,' 'extremely broad,' the 'broadest possible,' 'all-encompassing,' and 'sufficiently broad to cover any possible obligation' to make payment." (citations omitted)). It was Congress' intent, in defining "claim" so broadly, that "all legal obligations of the debtor, no matter how remote or contingent, [would] be able to be dealt with in the bankruptcy case...." *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125, 128 (2d Cir.2000) (*quoting United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir.1991)). *See also* Bradford Anderson, *Loan Participations and the Borrower's Bankruptcy*, 64 Am.Bankr. L.J., 39, 45 (1990) ("[b]y this broadest possible definition, and by the use of the terms throughout Title 11, [Section 101(5)(A)] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.").

■■■ While the term "claim" was drafted to be read broadly, it is not unlimited. In order for a claim to arise there must be a "right to payment." *See Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (*quoting Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). And, a "right to payment" is nothing more than an enforceable obligation. *Id.* Therefore, analysis of Bankruptcy Code sections 101(5) and 101(10) is not the end of the inquiry. Rather, it is beginning. These provisions do not create substantive rights, instead they set the context for the exercise of rights that may already exist. In this case, it means that in order for me to

determine whether BTM is a holder of a claim, and by implication a creditor, I must determine whether it has an enforceable obligation against the Debtor under applicable non-bankruptcy law. *See LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 497 (2d Cir.1995); *In re Caldor, Inc.—NY,* 240 B.R. 180, 192–93 (Bankr.S.D.N.Y.1999).

### B. *The Agreement Itself and Binding Precedent*

In order to determine whether BTM has a right to payment from the Debtor, I must first look to the terms of the agreements on which BTM bases its claim to see if a right to payment is found. The choice of law clause of the Participation Agreement will guide its interpretation. It states:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York. This Agreement may not be amended or otherwise modified except by a writing signed by both parties.

Participation Agreement at ¶ 17.

 In New York, when a court adjudicates the rights of parties to a contract it is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote. *See Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985); *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 412–13 (S.D.N.Y.1994). "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." *Slatt,* 64 N.Y.2d at 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (internal quotes omitted). Whether or not a writing is ambiguous is a question of law to be resolved by the courts. *See Van Wagner Adver. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986).

 I must first determine, as a matter of law, whether the terms of the contract are "sufficiently ambiguous to permit any proof concerning the subjective intent of the parties." *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980); *Sutton v. East River Sav. Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982). If the contract language is "unambiguous," I must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989).

 In order to determine whether a phrase in the Participation Agreement is "ambiguous," it is necessary to consider it in the context of the entire Participation Agreement. *See Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (" '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.' " (*quoting William C. Atwater & Co. v. Panama R.R.,* 246 N.Y. 519, 524, 159 N.E. 418 (1927))). A phrase is ambiguous only if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (citations omitted).

 Here, the Participation Agreement is unambiguous, and I must, therefore, give effect to the language used. *See Slatt,* 64 N.Y.2d at 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099. Notably, there is no provision that explicitly grants BTM a right to payment from the Debtor. To the contrary, the agreement provides, in paragraph 10, that Fuji, as lead lender, shall retain "the right, *in its sole discretion,* ... to exercise or refrain from exercising any powers or rights which [Fuji] may have

under or in respect of the Letter of Credit Agreement ... including, without limitation, the right to enforce the obligations of [the Debtor] ...." Participation Agreement at ¶ 10 (emphasis added).

Despite the explicit language in the Participation Agreement stating that Fuji, as lead lender, would retain the exclusive right to assert a claim under the LCA against the Debtor, BTM argues that the agreement should be read otherwise. It argues that one sentence, in the introduction section of the agreement, controls. That sentence reads:

"We hereby confirm that we are to sell and transfer to you, and that you are to buy and receive, an undivided interest and participation to the extent of 22.5% (your "Percentage Share") in and to the Letters of Credit and the obligations of [the Debtor] in respect of the Letters of Credit under the Letter of Credit Agreement, on the following terms and conditions:"

Participation Agreement at 1 (the "Undivided Interest and Participation Clause").

As discussed above, BTM argues that the Undivided Interest and Participation Clause can only be read to mean that Fuji affected a partial assignment of the LCA creating a joint loan or a tenancy-in-common with Fuji. In addition, BTM argues that after the assignment, Fuji's role, with respect to the portion of the LCA which BTM participated in, is that of a mere collection agent.

When the entire Participation Agreement is read, BTM's proposed interpretation of the Undivided Interest and Participation Clause is unconvincing and unreasonable. Instead, the clause in question appears to serve the more limited purpose of expressing that Fuji was conveying to BTM a 22.5 percent interest in 1) any proceeds from the loan and 2) any liabilities that may arise out of the underlying loan.

For example, paragraph 4(a) states that *Fuji will pay* to BTM its share of the

funds received by Fuji. This term demonstrates the parties' understanding that Fuji would be the party receiving payment from the Debtor. This reading is bolstered by the language in paragraphs 10, discussed above, 13 and 14. Paragraph 13 states that:

BTM shall have no interest in any property taken as collateral for any extensions of credit or loans made to the Debtor ... except [as the] proceeds [are] applied in reduction of such obligations and BTM has fulfilled its obligations then BTM will be entitled to its Percentage Share.

Participation Agreement at ¶ 13.

This paragraph reinforces the condition that BTM has a right to the "proceeds," not a right to payment from the Debtor, and that this right to proceeds arises only if BTM fulfills its obligations to Fuji. Similarly, paragraph 11 requires BTM to reimburse Fuji for its percentage share of any costs which Fuji incurs in connection with the collection or enforcement of the Debtor's obligations under the LCA. This paragraph, which also neither includes nor contemplates the possibility that LCA would enforce the LCA directly against the Debtor, further supports the conclusion that the parties did not intend to bestow that right on BTM. Thus, these four provisions, read together, unambiguously preclude BTM from a right to payment from the Debtor.

Furthermore, a logical reading of the LCA reveals that the Debtor and Fuji contemplated binding only each other and not third-parties (except assigns) by their agreement. For example, the LCA provides that the individual letters of credit must be honored by Fuji. Section 2.05, of the LCA, states that "[Fuji] shall cause to be credited ... with ... [Fuji's] own funds an amount equal to the aggregate Face Amount of all Notes [issued for which demand for payment may be made]."

Thus, even if BTM fails to remit payment once it has been informed that a letter of credit was issued, Fuji is still

liable under the LCA to the Debtor. BTM is insulated from any obligation to the Debtor. Since BTM is not contemplated anywhere in the LCA, and particularly in the terms of Section 2.05, BTM has no obligation to the Debtor. It is not logical, therefore, to read an obligation of the Debtor to BTM into the LCA.

Reading Paragraphs 4(a), 10, 11 and 13 of the Participation Agreement in conjunction with Section 2.05 of the LCA, I conclude that the parties unambiguously provided that only Fuji, the lead lender, has a right to enforce the LCA against the Debtor. The Undivided Interest and Participation Clause was unambiguously intended by the parties to convey to BTM less than a partial assignment.[5]

In the face of paragraph 10, and the rest of the Participation Agreement, which clearly demonstrates the parties' understanding that only Fuji would have the right to assert a claim directly against the Debtor for breach of the terms of the LCA, BTM argues that binding, if aged, Supreme Court and Second Circuit authority supports its position that the Undivided Interest and Participation Clause granted BTM an ownership interest in the underlying LCA and the right to assert a claim directly against the Debtor.

The first case that BTM argues is controlling is *Small Business Admin. v. McClellan,* 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960). BTM contends that "[t]he Supreme Court stated that the SBA,[6] because it was a participant in the loan, owned a distinct claim as a creditor of the bankrupt...."[7] *BTM's Response to Debtor's Motion to Reduce BTM's Claim*

*No. 150* at 5–6. Based upon this "statement," BTM concludes that I must find in its favor.

Contrary to BTM's assertion about the holding in *McClellan,* however, it is apparent that the Supreme Court was concerned about something very different from the rights of participants to assert claims in bankruptcy. In fact, the *McClellan* decision does not even mention the words "participant" or "lead bank." Nor does the Court discuss whether participants have a right to assert a claim against a debtor-borrower. Even the word "participation" is used only once in the decision in a policy discussion toward the end of the opinion regarding the policy implications of allowing the SBA to effectively share the government priority it enjoys in bankruptcy proceedings with a private bank that joined the SBA in making a loan to the debtor. *See McClellan,* 364 U.S. at 451–52, 81 S.Ct. 191.

The facts in *McClellan,* as articulated by the Supreme Court, are simple and quite distinct from the facts here. The SBA jointly lent $20,000 to the debtor, $5,000 of the loan having come from the funds of a private bank and $15,000 from the Government Treasury. *Id.* at 447, 81 S.Ct. 191. The issue before the Court was "whether, when the Administration has joined a private bank in a loan and the borrower becomes bankrupt, the Administration's interest in the unpaid balance of the loan is entitled to the priority provided for 'debts due to the United States' in R.S.[8] § 3466 and § 64 of the Bankruptcy Act, even though the Administration has agreed to

---

5. In coming to this conclusion, I note that under New York law the Participation Agreement does not create a tenancy-in-common and that other courts have treated participants *vis-a-vis* borrowers in analogous situations similarly. *See,* the discussions regarding tenancies-in-common and the treatment of similar situations by other courts, *infra. See, generally, Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548 (2d Cr.1976); *In re Yale Express Sys., Inc.,* 245 F.Supp. 790 (S.D.N.Y. 1965).

6. Small Business Administration.

7. This case was decided under the Bankruptcy Act. When the Bankruptcy Act was succeeded by the Code, the term "bankrupt" was replaced by the term "debtor."

8. Revised Statutes.

share any money collected on the loan with the private bank." *Id.*

Why then does BTM rely on a case so dissimilar from the facts presented here? In order to answer this question it is necessary to examine the Court of Appeals and District Court opinions which preceded the Supreme Court decision relied upon by BTM. In each of those decisions, the deciding court focused on a different aspect of the facts before it. The District Court believed that the relationship between the debtor, the private bank and the SBA was that of borrower, lead bank and participant respectively. *See In re Byquist,* 168 F.Supp. 483, 484–85 (D.Kan. 1958). In particular, the District Court focused on the facts that the debtor applied to the private bank for the loan, that the SBA paid more than $15,000 to the private bank, and that the private bank, in turn, lent the money to the debtor. *Id.* In addition, the District Court noted that the note executed by the debtor obligated him to pay the private bank only, albeit in accordance with conditions which referenced the SBA. *Id.* Finally, the District Court noted that following the debtor's filing for bankruptcy, the bank assigned the note to the SBA. *Id.* The issue before the court was whether the SBA is entitled to an administrative priority for its claim. *Id.* at 483–84. Interestingly, the District Court held, in part, that based upon the facts before it, which are similar to the facts before me, the SBA, as a participant, could not seek payment directly from the debtor based upon the note between the debtor and the private bank. *Id.* at 486. "Until the assignment of the note by the bank to the Small Business Administration there was no means by which Small Business Administration could force the bankrupt to make any payments to it even in the event that the bank refused to carry through the agreement between the bank and Small business Administration." *Id.*

The Court of Appeals affirmed the District Court on different grounds. The court pointed out that the debtor applied for the loan in question "on a Small Business Administration form, entitled 'Limited Loan Participation Application for Loan' ...." *Small Business Administration v. McClellan,* 272 F.2d 143, 144 (10th Cir.1959). The note also provided that the debtor agreed to reimburse the holder and the SBA for any expenses incurred by them in connection with the loan. *See id.* Furthermore, the private bank only agreed to lend the money to the debtor if the SBA provided 75 percent of the cash. *Id.* Finally, the private bank agreed that on five days written demand, it would transfer the note to the SBA and that the holder of the note would service it and remit to the other party its *pro rata* share. *Id.*

Since the Court of Appeals identified several unique facts that set the case before it apart from a typical loan participation situation, it is not surprising that the court did not focus or even discuss SBA's rights as a participant. Instead, the court focused on whether the SBA was standing in the shoes of the United States or a private party by virtue of its agreement to share the proceeds and any distribution ratably with the private bank. *Id.* at 145–46.

Based upon the facts identified by the Court of Appeals, it is clear why the Supreme Court treated the loan at issue as a joint loan instead of a participation.[9] *McClellan,* 364 U.S. at 447, 81 S.Ct. 191. It is for these same reasons that this case is not binding here: the debtor used an SBA form to originate the loan; the SBA had the unilateral right to take possession of the note and the debtor agreed to reimburse the SBA for its expenses incurred in connection with the loan. *McClellan,* 272

---

9. It is also important to note that the SBA, as a subdivision of the United States Government, was created by an Act of Congress for a specific purpose different from ordinary corporations. *See McClellan,* 364 U.S. at 447, 81 S.Ct. 191. This special role which the SBA serves was certainly considered by the Supreme Court. *See id.*

F.2d at 144. Here, in contrast, the LCA was exclusively between Fuji and the Debtor. BTM was not mentioned in the LCA. In addition, BTM has no right under either the LCA or the Participation Agreement to unilaterally take possession of the note. Since both the facts and the questions of law before the Court in *McClellan* were different from this case, I find that it is not binding here.

The other case BTM cites as binding authority is *In re The Westover*, 82 F.2d 177 (2d Cir.1936). As with *McClellan*, the facts in *The Westover* are different from those here. The most significant of the differences is that the agreement at issue was not a participation, at least not the modern type of participation common today and embodied in the Participation Agreement.

In *The Westover*, the court was faced with a situation where the Prudence Company issued certificates to individual investors for assignments of undivided shares in a mortgage. *Id.* at 178 & 180. The Prudence Company did not hold title to the underlying mortgage in which the certificate holders had been sold an interest. *Id.* Rather, nominal title was vested in a bank which held title in trust for the benefit of the certificate holders. *Id.* The Second Circuit affirmed the District Court's confirmation of a plan of reorganization supported by the individual certificate holders, but opposed by the Prudence Company. *Id.* at 181. The court concluded that the Prudence Company could collect payments made on the underlying mortgage only as agent for the certificate holders, because the Prudence Company, except to the limited extent that it was also a certificate holder, had no direct claim against the underlying mortgagor. *Id.* at 177–81. Significantly, the court came to its conclusion, in part, because the underwriter of the participation certificates had represented that the certificates were outright assignments of the mortgage loan itself. *Id.* at 179–80. Finally, the Second Circuit also noted that the Prudence Company had assigned all of its interest in the mortgages to a wholly owned subsidiary and, therefore, relinquished any interest it had in the mortgages. *Id.* at 181.

Here, in contrast, Fuji holds title, not as a mere agent, but as a direct lender, with a direct claim. Furthermore, the Participation Agreement, when read in its entirety, does not provide that an outright assignment to BTM was affected, since, for example, BTM did not retain the right to freely alienate its share. Therefore, the facts of *The Westover* and the agreement at issue in that case are factually distinguishable from the Fuji–BTM agreement and the facts of the matter before me.

Beyond the factual differences between *The Westover* and the case before me, there is another reason not to follow it as binding authority. The *Westover* decision is more than sixty years old. Since it was decided in 1936, the use of and the law relating to participation agreements has evolved significantly. During this period, many courts have grappled with questions similar to the one facing me, whether a participant may assert a claim directly against a debtor-borrower. Every one of the cases holds that participants may not. Furthermore, none of them, including several in this Circuit, rely upon or cite to *The Westover*. Since *The Westover* is factually distinct from the case before me and is of some antiquity, I find that it is not controlling here.

### C. *The Law of Participation Agreements*

█ Participation agreements are a form of multiple lender transaction. Multiple lender transactions have been an investment device for more than one hundred years. *See* W.H. Knight, Jr., *Loan Participation Agreements. Catching Up With Contract Law*, 1987 Colum.Bus.L.Rev. 587, 592 (1987). From the beginning, ownership and control of some single mortgages, known as split mortgages, were in the hands of many as participants. These split mortgages, which came

to be known as syndicated loans, were actually joint ventures where each participant received an executed note from the mortgagor. *See id.* A syndicated mortgage, by virtue of its individual mortgage note, provides each lender recourse against the borrower. *See* Billie J. Ellis, Jr., et al., *"Easy Street" or "Risky Business"?—Why Loan Participants Can't Afford To Be Passive Investors,* SC78 A.L.I.-A.B.A. 547, 550 (1998) (*"Why Loan Participants Can't Afford to be Passive"*).

■■■ Modern multiple lending agreements are often classified as either participation agreements (true participations), interbank loans, or syndication agreements. *See Why Loan Participants Can't Afford to be Passive* at 549. The most common multiple lending agreement is the loan participation which involves two independent, bilateral relationships: the first between the borrower and the lead bank and the second between the lead bank and the participants. *See id.* at 548. As a general rule, the participants do not have privity of contract with the underlying borrower. *See id.* In an interbank loan, one bank lends the funds of another bank which, in turn, lends to the borrower. In a syndication agreement, the banks jointly lend money. *See id.* at 550.

One aspect of loan participations that makes them attractive is the delegation of administrative tasks, like origination costs and servicing responsibilities to a lead lender. *See European American Bank v. Sackman Mortg. Corp. (In re Sackman Mortg. Corp.),* 158 B.R. 926, 931 (Bankr. S.D.N.Y.1993); *First Nat'l Bank of Belleville v. Clay–Hensley Com'n Co.,* 170 Ill. App.3d 898, 121 Ill.Dec. 411, 525 N.E.2d 217, 220 (1988). Participants are able to invest in loans offering good returns without having to invest in the administrative staff required to originate them on their own. *See First Nat'l Bank of Belleville,* 121 Ill.Dec. 411, 525 N.E.2d at 220.

Other reasons that banks enter into participation agreements include: diversifying lending portfolios by region and property

type, *see id.;* spreading the risk associated with extending credit, *see In re Sackman,* 158 B.R. at 931; achieving a higher interest rate on a loan than would be typically available if the participant had directly extended the loan to the borrower, *see Why Loan Participants Can't Afford to be Passive* at 550–51; and avoiding the lending limits imposed on banks under federal banking law, *see Hibernia Nat'l Bank v. F.D.I.C.,* 733 F.2d 1403, 1404–05 (10th Cir. 1984) (noting that the amounts "participated out" on a nonrecourse basis are not subject to the bank's lending limit).

### D. Persuasive Authority

■■■ The courts are generally in agreement that a transfer of an undivided interest and participation in the context of a true participation does not allow the participant to assert a claim against the borrower. *See First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank and Trust Co. of Chicago,* 933 F.2d 466, 467 (7th Cir.1991) (noting that in a typical participation arrangement, "only the lead bank has a direct contractual relationship with the borrower."); *Hibernia Nat'l Bank v. F.D.I.C.,* 733 F.2d 1403, 1407 (10th Cir. 1984) (holding that participants may "look solely, to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers."); *Depositors Trust Co. of Augusta v. Frati Enters., Inc.,* 590 F.2d 377, 379 (1st Cir.1979) (finding that the lead bank, rather then 100% participant, is a creditor of the borrower); *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 408 (S.D.N.Y.1994) (stating that a "participant is not a lender to the borrower and has no contractual relationship with the borrower."); *Mason & Dixon Lines, Inc. v. First Nat'l Bank of Boston,* 86 B.R. 476, 480 (M.D.N.C.1988), *aff'd,* 883 F.2d 2 (4th Cir.1989) (concluding that "participants are not generally creditors of the borrower. Accordingly, any collections and filing of proofs of claim in bankruptcy should be

made by the party to whom the underlying obligation is owed, namely the lead lender."); *In re Yale Express Sys., Inc.*, 245 F.Supp. 790, 792–93 (S.D.N.Y.1965) (holding that a loan participant is not a creditor of the debtor-borrower); *In re Felicity Assocs.*, 197 B.R. 12, 14–15 (Bankr.D.R.I. 1996) (holding that only the lead bank is a creditor of the debtor); *In re Consolidated Properties Ltd. Partnership*, 170 B.R. 93, 96 (Bankr.D.Md.1994) (holding that only the lead lender, and not the participants, may vote to accept or reject a plan of reorganization as the creditor who holds the claims underlying the loans); *In re Coronet Capital Co.*, 142 B.R. 78, 81 (Bankr.S.D.N.Y.1992) (stating that it "adopt[s] *Yale's* holding. A true participation agreement is one that ... only the lead can seek legal recourse against the borrower ..."); *F.D.I.C. v. Adams*, 187 Ariz. 585, 931 P.2d 1095, 1104–05 (App. 1996) (holding that the participant cannot sue the borrower to enforce the loan agreement because it has no legal relationship to the borrower); *Bank of Chicago v. Park Nat'l Bank*, 266 Ill.App.3d 890, 203 Ill.Dec. 915, 640 N.E.2d 1288, 1296 (1994) (stating that "[p]articipants can look only to their lead bank for satisfaction of claims arising out of the transaction; they are not themselves creditors of the borrower and so cannot assert creditor claims against the borrower."); *First Bank of WaKeeney v. Peoples State Bank*, 12 Kan.App.2d 788, 758 P.2d 236, 238 (1988) (noting that "[t]he participant bank has no legal relationship with the borrower. The borrower's and participant's relationships are solely with the lead bank."); *First Nat'l Bank of Belleville v. Clay–Hensley Comm'n Co.*, 170 Ill.App.3d 898, 121 Ill.Dec. 411, 525 N.E.2d 217, 221 (1988) (concluding that "so far as the participation loan is concerned the lead is the only party empowered to collect it since the lead is the only party to whom it is owed." (internal quotations omitted)). *See also Corporate Financing, Inc. v. Fidelity Nat'l Title Ins. Co. of New York (In re Corporate Financing, Inc.)*, 221 B.R. 671, 678 (Bankr.E.D.N.Y.1998);

*In re Autostyle Plastics, Inc.*, 216 B.R. 784, 791 (Bankr.W.D.Mich.1997), *aff'd sub nom. Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics)*, 1999 WL 1005647 (W.D.Mich.1999); *European Am. Bank v. Sackman Mortg. Corp. (In re Sackman Mortg. Corp)*, 158 B.R. 926, 933 (Bankr. S.D.N.Y.1993); *Continental Fed. Sav. Bank v. Centennial Dev. Corp.*, 1991 WL 834856, *1, 23 Va.Cir. 275 (1991).

I found two of these cases to be particularly instructive because of their factual similarities to the matter before me. *See In re Yale Express Sys., Inc.*, 245 F.Supp. 790 (S.D.N.Y.1965) and *Mason & Dixon Lines, Inc. v. First Nat'l Bank of Boston*, 86 B.R. 476, 480 (M.D.N.C.1988), *aff'd*, 883 F.2d 2 (4th Cir.1989).

In *In re Yale Express System*, the debtor-borrower borrowed money from First National City Bank ("FNCB"). FNCB, in turn, sold an "undivided 40% participation" in the loan, pursuant to a participation agreement, to Marine Midland Trust Company of New York ("Marine"). *In re Yale Express Sys., Inc.*, 245 F.Supp. at 791. The participation agreement provided that FNCB retained the sole right to agree to changes in the terms of the credit agreement with the debtor, except for changes in the terms of payment of principal, interest, premiums or fees. *Id.* at 791–92. Also, FNCB retained the sole discretion to exercise any remedy in connection with a default. *Id.* at 792.

Marine had a longstanding relationship with the debtor including a separate account it maintained with Marine. *Id.* In fact, the Yale Express court noted that Marine's longstanding relationship with the debtor undoubtedly served as an inducement for it to become a participant in the loan to Yale Express. *Id.* at 793. After the debtor defaulted on the loan to FNCB and filed for bankruptcy, Marine sought to setoff the money it held on deposit against the money the debtor owed to FNCB (and indirectly Marine) under the loan.

The District Court denied Marine's application because it had no direct creditor relationship with the debtor under the participation agreement. *Id.* at 792. "I find that the provisions of the participation agreement between Marine and FNCB, particularly when read in the light of various agreements between Yale and FNCB negate the existence of any such creditor status as Marine now claims." *Id.* The court reasoned that under the participation agreement Marine advanced money only to FNCB and that Marine's right to repayment would arise only upon receipt by FNCB of payment from Yale. *Id.* The court also relied on the fact that FNCB retained the right to modify the loan agreement and to enforce any rights under the loan agreement in the event of a default. *Id.*

The *Yale Express* case is almost on all fours with this case. Here, as in *Yale Express*, BTM had a long-standing credit relationship with the Debtor which undoubtedly influenced its decision to become a participant in the LCA. Furthermore, BTM advanced money only to Fuji and, under the Participation Agreement, BTM's right to repayment arises only upon Fuji's receipt of payment from the Debtor. Lastly, under the Participation Agreement, Fuji retained the sole right to modify the LCA (except for certain limitations similar to those imposed upon FNCB under its participation agreement with Marine) and to enforce any rights or remedies in the event of a default by the Debtor. Following *Yale Express*, I conclude that BTM is not a creditor of the Debtor.

*Mason Dixon Lines Inc. v. First National Bank of Boston* is analogous to this case. In *Mason Dixon*, the debtor borrowed money from First National Bank of Boston ("Bank of Boston"). *Mason & Dixon Lines*, 86 B.R. at 477. On the same day that the debtor entered into the loan agreement with Bank of Boston, Bank of Boston entered into a participation agreement with Third National Bank of Nashville, Tennessee ("Third National"). *Id.*

The participation agreement provided that Bank of Boston would credit Third National with an undivided 50% interest in the loan. *Id.*

Subsequently, the debtor filed for bankruptcy and Bank of Boston filed a proof of claim for the entire amount of the indebtedness due under the loan agreement. *Id.* During the course of the case, the debtor continued to make payments on the loan to Bank of Boston. *Id.* at 478. After two years of making payments, the debtor filed an objection to Bank of Boston's claim on the ground that Bank of Boston could properly claim only the percentage of the loan that has not been participated by Third National. *Id.* The debtor argued that the remainder of the loan was owed to Third National instead of Bank of Boston. *Id.* The Bankruptcy Court held that Bank of Boston's creditor status was not altered by the participation agreement with Third National and that Bank of Boston was entitled to file a proof of claim for the entire amount. *Id.* The Bankruptcy Court also found the debtor's motion so lacking in merit that it warranted the imposition of sanctions. *Id.* at 477.

On appeal, the District Court affirmed the Bankruptcy Court. *Id.* at 484. Holding, in part, "that participants are not generally creditors of the debtor. Accordingly, any collections and filing of proofs of claim in bankruptcy should be made by the party to whom the underlying obligation is owed, namely the lead lender." *Id.* at 480.

BTM attempts to muddy the otherwise clear picture that emerges from examining the authority in other jurisdictions by citing to a series of dissimilar cases which it contends stand for propositions in support of its case.

*In re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830 (Bankr.S.D.N.Y.1990), does not support the argument that BTM has a claim against the Debtor. In *Drexel Burnham*, the loan arrangement was not a true participation. Rather it was a joint loan where certain interests were assigned

to "Group Members." *In re Drexel Burnham Lambert Group Inc.*, 113 B.R. at 834. These Group Members made individual advances, charged different interest rates and their interests were evidenced by individualized notes. *Id.* The loan agreement also provided that the borrower's "obligation to repay principal and to pay interest ran directly to each lender." *Id.*

The loan agreement in *Drexel* is different from the one before me. That agreement had all of the hallmarks of a joint loan with, unlike in a participation agreement, a direct debtor-creditor relationship established between the borrower and each of the lenders. In fact, the *Drexel* court specifically noted that "[these features] underscore that this agreement far exceeds the usual single note joint loan nature of loan participation agreements." *Id.* at 844. Since this case is neither factually nor legally similar to the one before me, it is unpersuasive.

■ *Savings Bank of Rockland County v. F.D.I.C.* is similarly unpersuasive. 668 F.Supp. 799 (S.D.N.Y.1987), *vacated,* 703 F.Supp. 1054 (S.D.N.Y.1988).[10] In that case, the participant, The Savings Bank of Rockland County ("Rockland"), sought to ascertain its rights under a particular participation agreement *vis-a-vis* the lead bank, Peoples National Bank of Rockland County ("Peoples"). In addition to this very different legal issue, the facts facing the court in *Rockland* are also distinguishable.

Peoples originally held approximately 164 consumer loans with a face value of about $4 million. *Rockland,* 668 F.Supp.

at 802. Peoples soon realized that it was chronically undercapitalized and sought to sell the loans. *Id.* at 801. It sold an 80 percent interest to Rockland. *Id.* at 802. Peoples guaranteed Rockland's interest in the event of default and waived its own ability to "waive, modify, release or consent to postponement of any borrower's obligation" without the consent of Rockland. *Id.* at 802–03. Rockland also received an interest rate higher than the underlying loan. *Id.* at 806. Peoples then went into receivership and the receiver, the F.D.I.C., "disaffirmed" the participation agreement and refused to forward any of the $1 million it received as payments under the loans. *Id.* at 803. The question for the court was whether Rockland had an ownership interest in those proceeds. The court found that it did. *Id.* at 804.

The question before me, however, is not whether the participant has an ownership interest in loan proceeds received by the lead lender, but whether a participant has a right to assert a claim against a debtor-borrower in bankruptcy.[11] The agreement before the court in *Rockland,* moreover, is very different from a typical true participation or the Participation Agreement. For example, the lead lender guaranteed Rockland's interest in the event of default; Peoples did not retain the right to proceed against the borrower; Rockland was promised a greater interest rate than the underlying loan agreement provided, and the overall lead position Rockland took in the loan. None of these facts are present in this case. Significantly, even in this case, Peoples, not Rockland, collected from

---

10. The Trustee argues that because this decision was vacated it has no precedential value. This argument is misguided. While it may be true that the act of vacating an opinion diminishes its value as binding precedent, it has no effect on the persuasiveness of the decision. *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. 882, 889 (Bankr.S.D.N.Y.1993) ("a logical and well-reasoned decision, despite vacatur, is always persuasive authority, regardless of . . . its ability to bind.").

11. In this regard, *Rockland* is inapposite to this case. BTM has not asserted that it believes that Fuji will not forward its percentage share once it receives a distribution from the Debtor. Furthermore, if they did, there is no question that BTM could assert a claim, pursuant to the Participation Agreement, against Fuji.

the borrower. Since the *Rockland* decision is both factually and legally distinguishable from the matter facing me, I find it unpersuasive.

Next, BTM suggests that *Franklin v. Commissioner of Internal Revenue,* 683 F.2d 125 (5th Cir.1982), stands for the proposition that the Fifth Circuit has held that a participant may assert a claim directly against a borrower. In fact, *Franklin* did not address that question.

In *Franklin,* the Fifth Circuit held that a sale of participations converted the borrower's creditors from one bank to a group of banks, regardless of which bank serviced the loan and regardless of whether the debtor knew of the participants. *See Franklin,* 683 F.2d at 129. The court was not concerned with the rights of participants *vis-a-vis* borrowers. It was only concerned with the tax implications of the transaction. Indeed, the appeal came to the Circuit Court from the Tax Court.

Unlike the facts of *Franklin,* I am not concerned with the tax implications of various participation arrangements. Specifically, the borrower in *Franklin* sought to take a tax deduction on its interest payments, made with funds borrowed from the lead bank, on the loans to the extent the loans were sold to the participants. *See id.* at 129. The answer to that question has nothing to do with whether a participant may assert a claim in bankruptcy. Furthermore, *Franklin* is factually different from the one here because there has been no additional borrowing from Fuji to repay the LCA. Finally, it is worth noting that the *Franklin* court never discussed the bankruptcy implications of its decision. *Franklin* is simply not helpful to BTM's argument.

*F.D.I.C. v. Fortenberry Farms Inc.* is also factually different from the case before me. 754 F.Supp. 86 (M.D.La.1990). *Fortenberry* involved a sale of an "undivided 91.667 % interest" in a note and its

security from one bank, Southern Mortgage Company of Louisiana, Inc. ("Southern"), to another bank, Audubon Federal Savings and Loan Bank Association ("Audubon"), pursuant to a participation agreement. *Id.* at 87. The lead bank, Southern, not only guaranteed the participant's return on the loan, but the President and two officers of the lead (the "Individual Guarantors") personally guaranteed the loan. *Id.* The lead and the Individual Guarantors also promised to sell the participant's position to someone else within twelve months of funding the loan. *Id.* Audubon, the participant, later failed and a receiver, the FSLIC, was appointed. *Id.* The borrower, Southern and the Individual Guarantors all failed to perform under either the underlying loan, the participation agreement or the guarantees. *Id.* at 87–88. The receiver then brought an action against all of these parties. The District Court, in granting summary judgment to the receiver, held that the receiver had standing to assert contractual claims directly against the borrower. In so deciding, the court simply stated, without analysis of any case law,[12] "[i]t is apparent that Southern assigned a 91.667% ownership interest to Audubon in both the promissory note and its security . . . ." *Id.* at 88.

There are several reasons why I do not find *Fortenberry Farms* persuasive. First, the lead and the Individual Guarantors were also defendants in the action and apparently could not or would not assert a claim directly against the borrower. Thus, unlike in this case, the participant would have had no way to enforce its rights. Second, the motion for summary judgment was unopposed and the District Court apparently did not consider any of the case law relevant to the issue before me. Finally, the receiver was a branch of the federal government, established by statute, and mandated to make recoveries for the benefit of the failed bank's depositors and tax payers in general. Therefore, the

---

12. One reason why the court may not have analyzed this issue further is because the re-

ceiver's summary judgment motion was unopposed. *Fortenberry Farms,* 754 F.Supp. at 88.

court in *Fortenberry Farms* was faced with a strong equitable reason to find a way to allow the receiver to proceed. For all of these reasons, I do not find this case persuasive. Furthermore, to the extent that this case may be read for the proposition that participants may assert claims directly against borrowers in bankruptcy proceedings, I do not to follow it.

Lastly, BTM cites *In re Argonaut Financial Services,* 164 B.R. 107 (N.D.Cal. 1994), which, at best, stands for the limited proposition that a borrower in bankruptcy must, in some circumstances, give participants notice of certain bankruptcy proceedings. This conclusion is very different from the question of whether participants have a right to assert a claim against a debtor-borrower. This question was unanswered by the court in *Argonaut.*

E. *Status as Tenants in Common*

 BTM next argues that, under New York law, the Undivided Interest and Participation Clause should be construed to grant BTM the rights of a tenant in common with Fuji in the LCA. In order for a tenancy in common to exist "two or more persons [must] each own and possess an undivided interest in property, real or personal." *Chiang v. Chang,* 137 A.D.2d 371, 529 N.Y.S.2d 294, 295 n. 1 (1st Dept.[13] 1988). A tenancy in common, therefore, is created when a holder of an ownership interest in property assigns part of that interest to another party. Here, since only Fuji is a party to the LCA, the question is whether the Participation Agreement affected a partial assignment of Fuji's interest to BTM. Under New York law that question must be answered in the negative.

 Notably, BTM cites to no case law in which a participation agreement, many of which contain clauses similar to the Undivided Interest and Participation Clause, is construed in the manner in which BTM asks me to construe this agreement. The reason is clear. The rights created by a tenancy in common are very different from those created by a participation agreement. "Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke." *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 413 (S.D.N.Y.1994) (*citing Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 558 (2d Cir.1976)). Here, none of these factors are present. Fuji, not BTM, retains almost complete control over the funds and the collateral. In addition, Fuji is given the sole right to collect monies under the LCA or to enforce rights in the event of a default. Furthermore, under the Participation Agreement, BTM does not have the right to assign its interest absent written consent from Fuji. *See Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d at 558 ("[a]n assignment at law contemplates 'a completed transfer of the entire interest of the assignor in the particular subject of the assignment, whereby the assignor is divested of all control over the thing assigned.'" (*quoting Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.,* 10 A.D.2d 372, 199 N.Y.S.2d 852, 855 (4th Dept.1960))). Since BTM has none of the ownership rights typically associated with a tenant in common, I find this argument lacking in merit.

F. *Effect of Banking Regulations*

 BTM also maintains that because the portion of a lead bank's loan which is sold as a participation interest is not included in the lead bank's calculation of outstanding credit, the participated portion should be viewed for bankruptcy purposes as sold and assigned. *See* 12 C.F.R.

---

13. I believe that "Dept." is the proper way to abbreviate the word "department" when referring to one of the Departments of the Appellate Division of the Supreme Court. I am aware that the editors of The Bluebook suggest "Dep't". The Official New York Law Reports: Style Manual (1982), however, supports my analysis of this issue. It seems to me that I should defer to the State's officially stated preference in this matter.

§ 32.2(j)(2)(iv) (1998). · This regulation, which was established by the Comptroller of the Currency, is meant to ensure the solvency of banks by preventing banks from making excessive loans. *See* 12 C.F.R. § 32.1(a) (1999). Since participants adopt a proportionate risk of loss on an underlying loan to the extent of the participation, it is sensible that the participation is not included in the lead bank's books as an outstanding loan.

Despite the fact that participations are listed a certain way on lead banks' books, I disagree with BTM that this regulation has any relevance to the matter before me. In this case, the parties contractually agreed to limit BTM's rights and obligations under the Participation Agreement. They could have entered into a different type of arrangement with different rights and responsibilities, but they chose this one. Thus, I reject this argument as irrelevant.

### G. *The Extrinsic Evidence*

■ Lastly, BTM claims that by viewing the "unique circumstances" of this transaction together, the court should find that the parties intended for BTM to have a direct claim against the Debtor. This broader perspective, it argues, can only be understood by reading the Participation Agreement in conjunction with the Extrinsic Materials.

■ As I discussed above, the Participation Agreement is unambiguous. Once that determination is made, the rule in New York is that parol evidence is not admissible to establish a contract's meaning. "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone, without resort to extrinsic evidence." *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F.Supp. 401, 413 (S.D.N.Y.1994) (*citing John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994)). *See also Nicholas Labs. Ltd. v. Almay, Inc.*, 900 F.2d 19, 20–21 (2d Cir. 1990); *Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A.*, 570 F.Supp. 870, 893 (S.D.N.Y.1983) ("where there is no inherent ambiguity, courts should not ... reach an artificial interpretation in order to relieve a party from an improvident bargain"); *In re Yale Express Sys., Inc.*, 245 F.Supp. 790, 792–93 (S.D.N.Y.1965); *European Am. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 932 (Bankr.S.D.N.Y.1993). It is also well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Intercontinental Planning Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). *See also W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986). Here, the agreement is unambiguous and, as a result, I will not look beyond the four corners of the Participation Agreement to construe its meaning.

Even if I did consider the evidence offered by BTM, it does not show that the parties intended that BTM have a direct claim against the Debtor as to this participation agreement. The documents offered by BTM include an affidavit of Akira Takeuchi, Vice President of BTM, a letter from Okura–Japan to BTM and an "Agreement for Credit Instrucion" [sic]. In the Takeuchi affidavit, Mr. Takeuchi asserts that the participation agreement should not be considered an independent contract but instead should be considered an integral part of a longstanding credit relationship between BTM and the Debtor's parent, Okura–Japan. According to Takeuchi, BTM and the Debtor have been doing business together since Okura–Japan's inception. This relationship has included negotiations between BTM, the Debtor and Okura–Japan regarding credit extensions, the submission of credit applications to BTM by Okura–Japan on behalf of the Debtor and an express guarantee of all of

 

the Debtor's obligations, including those under the Participation Agreement.

None of these assertions, even if relevant, defeat the plain wording of the Participation Agreement and the two documents to which it refers, the LCA and the Participation Certificate. The fact that BTM had a longstanding credit relationship directly with the Debtor or with its parent does not mean that at any particular time they were not free to change this relationship or enter into a contract with another party, like Fuji, in order to do business indirectly with the Debtor. BTM and the Debtor, as sophisticated business entities, could have achieved a direct lending relationship by the terms of the agreement, but did not. *See In re Yale Express Sys., Inc.,* 245 F.Supp. at 793 ("it is hornbook law that the parties to agreements are presumed to have intended just what their agreements set forth. That Yale may have known of, approved of, or requested Marine's participation does not establish a modification or novation of the agreements or in any matter raise Marine to the status of creditor in these circumstances."). Considering the Extrinsic Materials, therefore, would not alter the plain meaning of the Participation Agreement or BTM's status as a non-creditor in this proceeding as to the Debtor's indebtedness under the LCA.

## VI. CONCLUSION

BTM's opposition to the Trustee's motion can be aptly summarized as a blunderbuss defense. Instead of identifying a single legal theory upon which to rely, BTM attempts to defeat the Trustee's motion by making a series of unconnected, non-compelling arguments. Apparently, BTM was hoping that by creating a veritable cloud of arguments and issues, the underlying weakness of its position would not be exposed. Once the essence of BTM's position was identified, and its spurious arguments cleared away, it was apparent that its position is untenable. Furthermore, given the sophisticated nature of the par-

ties, it is not unfair, from a policy standpoint, to strictly construe the terms of a participation agreement and hold the parties to the bargain they struck. The Trustee's motion, therefore, is granted in its entirety.

Settle Order.