**In re AEROVIAS NACIONALES DE COLOMBIA, S.A. AVIANCA,**

**and**

**Avianca, Inc., Debtors.**

**Nos. 03–11678 (ALG), 03–11679(ALG).**

United States Bankruptcy Court, S.D. New York.

May 6, 2005.

Smith, Gambrell & Russell, LLP, by Ronald E. Barab, Esq., Jason S. Bell, Esq., Colin R.P. Delaney, Esq., Atlanta, GA, for Debtors.

Fulbright & Jaworski LLP, by David A. Rosenzweig, Esq., New York, NY, for Pegasus Aviation, Inc.

Kaye Scholer LLP, by Sheldon L. Solow, Esq., Richard Smolev, Esq., New

York, NY, for Ansett Worldwide Aviation, U.S.A., Ansett Worldwide Aviation Limited, AWMS I and AWMS III.

Greenberg Traurig, LLP, by Richard Miller, Esq., Robert Honeywell, Esq., New York, NY, for the Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION

ALLAN L. GROPPER, Bankruptcy Judge.

Aerovias Nacionales de Colombia S.A. Avianca ("Avianca") filed for relief under Chapter 11 of the Bankruptcy Code (the "Code") on March 21, 2003 ("Petition Date") and confirmed a plan of reorganization on November 24, 2004. During the course of the Chapter 11 case, Avianca modified and, as modified, assumed several aircraft leases with entities represented by Pegasus Aviation, Inc. ("Pegasus") and Ansett Worldwide Aviation, U.S.A., Ansett Worldwide Aviation Limited, AWMS I and AWMS III (collectively, "Ansett").

On October 15, 2003, Pegasus filed proofs of claim 668, 669, and 670, totaling more than $14 million, that included amounts representing "rejection damages" in connection with the assumed Pegasus aircraft leases. Also, on that date, Ansett filed proofs of claim 733, 734, 735, and 736 totaling more than $22 million claiming rejection damages in connection with Avianca's assumption of the modified Ansett aircraft leases. "Rejection damages" for purposes of this decision means damages measured by the difference between the original lease rate for the aircraft and the lower rent under the lease as modified and assumed. On October 1, 2004, Avianca objected to the proofs of claim on the ground that the lessors were not entitled to rejection damages in connection with the assumed leases. Although the Pegasus and Ansett entities have many other unresolved claims against the Debtors, the only claims now before the Court for decision are the claims for rejection damages in connection with leases that were modified and, as modified, assumed.

For the reasons set forth below, the claims for rejection damages in connection with the assumed leases are denied.[1]

### FACTS

#### The Pegasus Agreements

Pegasus is a lease and aircraft servicer and manager for Pegasus Aviation I, Inc., Pacific Aircorp 24618, Inc., Pacific Aircorp 24835, Inc., PALS I, Inc., ART 23227, LLC, and ART Engine, LLC (collectively, the "Pegasus Lessors"). Avianca defaulted on the leases with the Pegasus Lessors for five aircraft and one additional spare engine prior to the Petition Date, and it failed to pay rent or reserves for the first two months after the filing. On April 10, 2003, Pegasus filed a motion on behalf of the Pegasus Lessors to dismiss the Avianca bankruptcy cases and shortly thereafter a motion seeking relief from the automatic stay under § 362(d) to terminate the leases and recover the aircraft and engine or, in the alternative, to obtain adequate protection for the Lessors' interest in the property. On May 5, 2003, Avianca responded with a motion under § 365 of the Code to reject all of the Pegasus leases.

Following the hearing on May 8, 2003 on Pegasus's motion to dismiss, but before a

---

**1.** The Pegasus and Ansett claims have been consolidated for purposes of this decision only. As will be seen hereafter, many of the issues are similar but the documents are somewhat different, and the facts relating to the various agreements have been considered separately. The Creditors' Committee has supported Avianca in objecting to the claims of both Pegasus and Ansett.

decision on that motion, the parties reached a settlement that was memorialized in a Memorandum of Understanding ("Pegasus MOU"). The Pegasus MOU provided, among other things, that Avianca would (i) continue to lease three Boeing 767 aircraft (leases N984AN, N985AN, and N986AN) for new terms and at lower monthly rents, and (ii) terminate the leases for two Boeing 757 aircraft and the one spare engine. (Pegasus MOU, p. 2–5.)

The Pegasus MOU provides generally that the amended leases would control the obligations of the parties regarding the assumed contracts from the Petition Date forward, and the new lease rates became effective as of the Petition Date. (Pegasus MOU, p. 2.) No post-petition rent had been paid, and Avianca was required to make cure payments on the assumed contracts and pay the accrued rent (at the new rates) covering the period from the Petition Date through "the next scheduled repayment day" over a period of 18 months without interest. (Pegasus MOU, ¶ II(i), (ii), pp. 2–3.) The Pegasus MOU also reserves for Pegasus certain pre– and post-petition claims:

> Subject to the foregoing amendments with respect to rent and maintenance reserves, Lessor reserves full rights to make any and all pre and post petition claims. For avoidance of doubt, any default by Debtor after May 21, 2003 in performance of the obligations of Debtor

under the ... leases, as amended in accordance with this MOU, including without limitation, those obligations undertaken by Debtor under the headings 'Lease Rate,' ... shall give rise to a post-petition claim entitled to administrative expense priority in Debtor's Chapter 11 proceedings notwithstanding that such obligation defaulted or not performed may relate to or have arisen during the 60 day period ending May 21, 2003.

(Pegasus MOU, pp. 3, 4.)[2] Additionally, the Pegasus MOU provides for several specific circumstances under which the terms of the original leases would control, including the following: failure of Avianca to confirm a plan consistent with the Pegasus MOU; dismissal or conversion of the cases to Chapter 7; or if Avianca voluntarily or involuntarily re-entered bankruptcy within a year of plan confirmation *and* committed an "Event of Default" with respect to the assumed leases. (Pegasus MOU, ¶ III(c), (d), p. 6.)[3]

It is important to note that the foregoing provisions appear only in those sections of the MOU relating to the three leases of Pegasus aircraft that were assumed. With respect to the leases of the two aircraft and one spare engine that were rejected, the "reservations of rights" clause was much broader, providing for retention by Pegasus of "All claims of

---

**2.** There were outstanding at the time several disputes between Pegasus and the Debtors relative to performance under the leases, including hotly contested issues related to Avianca's alleged failure to maintain the aircraft in the manner required under the leases.

**3.** "Event of Default" had been defined in § 17 of the Leases and was amended to include "(o) Debtor fails to confirm and consummate a plan of reorganization ... consistent with the Memorandum," or if the Chapter 11 case were dismissed or converted to Chapter 7. Should one of the events designated an

"Event of Default" occur, "the terms of the original Lease [would] govern in respect of the Lessor's rights, claims and remedies against Debtor, subject to credit for payments actually received under the amended Lease." (Pegasus MOU, ¶ III(c), (d), p. 6.) None of the listed events of default has occurred and only the third condition, Avianca's reentry into bankruptcy within a year of confirmation, is still relevant. Nothing in this Opinion is intended to affect the rights of the Pegasus Lessors if this condition should occur.

whatsoever kind or nature for damages resulting from or arising out of the termination of, or default or nonperformance by Debtor under, or arising out of the transactions contemplated by the [rejected leases]." [4]

On May 30, 2003, a Stipulation and Order was entered by this Court (the "Pegasus Stipulation and Order"), approving and adopting the Pegasus MOU. (Pegasus Stipulation and Order, ¶ 1, p. 3.) The parties were directed to commence immediate performance under the terms of the Pegasus MOU and to execute and deliver lease amendments consistent with its terms. (Pegasus Stipulation and Order, ¶ 2, p. 4.) Avianca was further directed to execute and deliver all documents necessary or appropriate to implement and effectuate the Pegasus MOU. (Pegasus Stipulation and Order, ¶ 2, pp. 3–4.) The Stipulation and Order entered by the Court also separately highlighted the circumstances under which the terms of the original leases would control the obligations of the parties. (Pegasus Stipulation and Order, ¶¶ 6–7, pp. 4–5.)

On August 29, 2003, the parties amended the assumed leases in accordance with the terms of the Pegasus MOU ("Pegasus Lease Amendments"). Section 17, "Events of Default," was amended to specify the circumstances under which the original lease terms would govern the rights and obligations of the parties and to identify the specific sections of the Pegasus MOU involved. (Pegasus Lease Amendments, ¶ 1(e), p. 4.) Likewise, Section 18 of the leases, as amended, entitled "Remedies," provides that the rights and remedies under the Pegasus MOU govern the relationship between the parties, "including without limitation upon the occurrence of a Default or Event of Default."

(Pegasus Lease Amendments, ¶ 1(f), p. 4.) Section 18 as amended also provides that subject to any cure rights the parties might have under the Pegasus MOU, "any default or breach by Lessee of its obligations under the [MOU] ... shall be deemed a Default or Event of Default ... entitling Lessor to the exercise of remedies under the Lease." (Pegasus Lease Amendments, ¶ 1(f), p. 4.)

On October 15, 2003, Pegasus filed proofs of claims that, among other things, seek more than $14 million in lease rejection damages in connection with the assumed leases. Damages were calculated as the difference between the full rent under the original leases for the period from the Petition Date through the originally scheduled expiration date of the leases and the rent to be paid under the leases as assumed and amended. On October 1, 2004, Avianca filed objections to the allowance of these rejection damage claims, arguing that under the terms of the Pegasus MOU, the Pegasus Stipulation and Order, and the amended leases themselves, Pegasus had no valid claim for the rent differential.

### The Ansett Agreements

Ansett leased five aircraft to Avianca prior to the Petition Date. Avianca was in default under its lease obligations at the time of the filing, and on April 15, 2003, five days after the motion to dismiss was filed by Pegasus, Ansett filed its motion to dismiss Avianca's Chapter 11 cases. Avianca responded on May 5, 2003, with a motion under § 365 of the Code to reject all of the Ansett leases.

Like Pegasus and at about the same time, Avianca and Ansett reached an agreement which they memorialized in a Memorandum of Understanding dated

---

**4.** The clause provided that such claims would all be treated as prepetition claims, with certain specific exceptions. These damage claims are not at issue herein.

May 23, 2003 ("Ansett MOU"). The Ansett MOU provided, among other things, that Avianca would continue to lease one Boeing 767 and three MD–83 aircraft, that the amended leases would be for different terms and at lower monthly rents than the prepetition leases, and that Avianca would terminate the lease for the remaining Boeing 767 aircraft. (Ansett MOU, pp. 2, 4.) The Ansett MOU further provided:

> Except as provided above, all other claims of whatsoever kind or nature for damages resulting from any default or nonperformance by Avianca through May 21, 2003 under or arising out of the transactions contemplated by [the assumed leases] shall be treated as prepetition claims; *provided, however,* any default or nonperformance after May 21, 2003 under the Lease, as amended, shall be deemed to have administrative expense priority in Avianca's Chapter 11 proceedings.

(Ansett MOU, p. 4, 6.) With respect to the amended leases, the Ansett MOU provided that the rent owed by Avianca from the Petition Date to May 21, 2003 (the cure amount) would be payable in 24 monthly installments, without interest, commencing on the first rent payment date under the assumed aircraft leases. (Ansett MOU, pp. 3, 5.)

As was the case with the Pegasus MOU, the foregoing provisions addressing reservations of rights related only to the assumed aircraft leases. The remaining aircraft, which was to be rejected pursuant to the terms of the MOU, was addressed in a separate section of the MOU. (Ansett MOU, p. 8.) As did the Pegasus MOU, the Ansett MOU provided a much broader reservation of rights with regard to damage claims arising out of the rejection of this lease as it did with respect to the assumed leases; as in the Pegasus MOU, it was also provided that these claims would be treat-

ed as prepetition claims. (Ansett MOU, p. 8.) The Ansett MOU further provided Ansett with the right of setoff with regard to such prepetition claims. (Ansett MOU, p. 8.)

A Stipulation and Order was so-ordered by this Court on June 2, 2003 (the "Ansett Stipulation and Order"), approving and adopting the Ansett MOU, ordering the parties to commence immediate performance, and directing Avianca to execute and deliver all documents necessary or appropriate to implement and effectuate the terms of the Ansett MOU. (Ansett Stipulation and Order, ¶¶ 1–2, p. 3.)

On February 23, 2004, the parties amended the leases in accordance with the terms of the Ansett MOU ("Ansett Lease Amendments"). Several Lease Amendments address the issue of damage claims directly. First, a section titled "MOU and Order" contains an express waiver by Ansett of Ansett's rights under § 365 of the Code to a cure payment for the assumed leases, providing instead that Ansett would have an unsecured, prepetition claim in the amount of the cure payment "except as otherwise set forth in the MOU and Order." (Ansett Lease Amendments, ¶ 1.1, p. 2.) Additionally, the section addressing "Prepetition Claims; Postpetition Claims" provides:

> Lessor and Lessee hereby acknowledge and agree that any claims for damages Lessor may have against Lessee arising out of or relating to any Event of Default arising under the Lease Agreement during the period from the Delivery Date through May 20, 2003 [the date of the MOU] ... shall be treated as prepetition claims under the Bankruptcy [Code], and Lessor shall be entitled to and shall so assert such claims in the Bankruptcy in lieu of asserting such claims against Lessee as post petition claims. Lessor and Lessee hereby ac-

knowledge and agree that any and all claims that Lessor may lawfully assert against Lessee arising out of or relating to any Default or Event of Default arising under or in connection with the Lease Agreement (as Amended hereby) from and after May 21, 2003, or any default in payment or performance of its obligations under this Amendment Agreement or the Order and the MOU, shall, for purposes of the Bankruptcy, be deemed a postpetition claim entitled to administrative expense priority in the Bankruptcy.

(Ansett Lease Amendments, ¶ 1.5, p. 3.)

The "General Provisions" in the Ansett Lease Amendments further provided that the amendments were to be effective as of May 21, 2003, and that each lease, which was to be assumed as amended, was "assumed for all purposes by Lessee." (Ansett Lease Amendments, ¶ 5.1.) The General Provisions went on to state that "except to the extent amended", each lease "remains unmodified and in full force and effect." (Ansett Lease Amendments, ¶ 5.1.) Among the provisions of the original leases that remained in effect was § 15, addressing "Remedies", and Ansett relies particularly upon § 15(d), which provides, among other things, that if Avianca defaults, Ansett may choose to relet the aircraft "to a third party unrelated to Lessor" and require Avianca to pay

> as liquidated damages for loss of a bargain and not as a penalty . . . the then present value of the aggregate unpaid [rent] for the Aircraft which would otherwise have become due over the Term therefore discounted monthly to present value as of the date of reletting at 6% per annum over the then present value of the aggregate basic rental payments to become due under the reletting (computed on the assumption that the term

of such reletting extends at least until the date on which the Term for the Aircraft would have expired but for such Event of Default) from the date of such reletting to the date upon which the Term for the Aircraft would have expired but for Lessee's default, discounted monthly to present value as of the date of the reletting at 6% per annum . . .

(Int'l Aircraft Lease Agreement of September 4, 1998, § 15, p. 69)

On October 15, 2003, Ansett filed proofs of claim 733, 734, 735, and 736, seeking more than $22 million in rejection damages calculated as the difference between the original rent under the assumed leases and the rent to be paid under the leases as amended. On October 1, 2004, Avianca filed objections to the allowance of these claims, arguing that under the terms of the Ansett MOU, the Ansett Stipulation and Order, and the amended leases, Ansett has no claim for rejection damages on the assumed leases.

## DISCUSSION

### Standards for Summary Judgment

▮ Summary judgment is appropriate when the court, taking all facts and reasonable inferences in a light most favorable to the non-moving party, determines that there is no genuine issue of material fact and that judgment should be entered in favor of the moving party. Fed. R.Civ.P. 56, made applicable by Bankruptcy Rule 7056; see *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir.2002). Avianca and Pegasus assert that the relevant documents comprising the agreement between the parties—the Pegasus MOU, the Pegasus Stipulation and Order, and the amended leases—are facially unambiguous. Similarly, Avianca and Ansett agree that the relevant docu-

ments comprising the agreement between the parties—the Ansett MOU, the Ansett Stipulation and Order, and the amended leases—are facially unambiguous. The fact that both parties agree that the documents are unambiguous does not mean that they are, especially where the parties disagree on the proper construction of the documents. As the court said in *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976), "The fact that both sides in the instant case sought summary judgment does not make it more readily available." Here, however, the Court concurs that the documents are clear on their face and unambiguous, and that the disputes can appropriately be decided on motions for summary judgment. See *Alexander & Alexander Svcs., Inc. v. Certain Underwriters at Lloyd's London*, 136 F.3d 82, 86 (2d Cir.1998) (internal citations omitted). Whether a contract is clear or ambiguous is to be decided by the court as a matter of law, and the Court determines that it can make this finding on the present record. *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir.1994).

▮▮▮▮ The law of the State of New York is the law applicable to the parties' agreements. (Pegasus Lease Amendments, ¶ 5; Ansett Lease Amendments, ¶ 3.)[5] "In New York, when a court adjudicates the rights of parties to a contract it is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote." *In re Okura & Co. (Amer-*

ica), *Inc.*, 249 B.R. 596, 603 (Bankr. S.D.N.Y.2000). Where a document is clear and unambiguous on its face, "the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Rainbow v. Swisher*, 72 N.Y.2d 106, 108, 531 N.Y.S.2d 775, 776, 527 N.E.2d 258, 259 (1988). The Court may look no further than the four corners of the documents memorializing the contract to find the parties' intent. See e.g.; *Heller v. Pope*, 250 N.Y. 132, 135, 164 N.E. 881, 882 (1928) ("plain meanings may not be changed by parol."); *Town of Hempstead v. Inc. Village of Atlantic Beach*, 278 A.D.2d 308, 311, 718 N.Y.S.2d 360, 362 (2d Dept.2000) ("evidence outside of the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.") (internal citations omitted).

### I. The Pegasus Claim

The Pegasus claim for rejection damages under the modified leases that Avianca assumed pursuant to the Pegasus MOU is based on two alternative theories, one sounding in contract law, the other in bankruptcy law.

### A. Contract Law: Pegasus's Rights Under the Modified Leases as Assumed

▮▮▮▮ For its claim that the original lease rates continue to apply with respect to the rejected leases, Pegasus relies pri-

---

5. The leases, as amended, designate the law of New York as governing. The Pegasus Lease Amendments state, "THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE IN SUCH STATE BY RESIDENTS THEREOF AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE." (emphasis in original). Similarly, the

Ansett Lease Amendments state, "This Amendment Agreement is governed by the internal laws of the State of New York, United States of America, without regard to its conflict of laws rules. This Amendment Agreement is being delivered in the State of New York." The MOU's do not designate a governing law, but the parties have not suggested that another law applies and cite New York law in their papers.

marily on language in the Pegasus MOU providing that "the Lessor reserves full rights to make any and all pre and postpetition claims." (Pegasus MOU, pp. 3, 4.) Pegasus asserts that through this language, it reserved all of its rights with respect to damages. However, Pegasus ignores the crucial introductory clause and qualifier that precedes the words that Pegasus cites: "Subject to the foregoing amendments with respect to rent and maintenance reserves . . . ." The instant dispute indubitably relates to "rent" under the leases. If the language were interpreted as Pegasus suggests, the introductory clause would be rendered meaningless. It is a cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other. *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 fn. 7 (2d Cir.1983) (internal citations omitted) (applying New York law); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981). On a plain reading of the documents, the rights that Pegasus reserved are "subject to the foregoing amendments with respect to rent . . .". (Pegasus MOU, pp. 3, 4.) See *Trans Intern. Airlines, Inc. v. United States*, 173 Ct.Cl. 312, 351 F.2d 1001, 1003 (1965).

The result of the foregoing is that Pegasus can only assert "pre and postpetition claims" if they do not conflict with the lease amendments relating to "rent". The amendments as they relate to rent provide explicitly that from the Petition Date forward, the new lease rates will apply. (Pegasus MOU, ¶ II(i), (ii), pp. 2–3.) As the lease amendments reduce the lease rate as of the Petition Date, to permit Pegasus to assert a claim *going forward* based upon the original lease rate would create an irreconcilable conflict within the documents. *Trump Equitable Fifth Ave. Co. v.*

*H.R.H. Constr. Corp.*, 106 A.D.2d 242, 244, 485 N.Y.S.2d 65, 67 (1st Dept.1985).

Additionally, the Pegasus MOU contains explicit provisions enumerating the circumstances under which the original lease terms would govern the obligations of the parties. (Pegasus MOU, pp. 3, 4.) The relevant circumstances include Avianca's failure to confirm a plan, a second filing for bankruptcy within a year of plan confirmation, and dismissal or conversion of the original case to Chapter 7. (Pegasus MOU, ¶ III(c), (d), p. 6.) To allow Pegasus to invoke the terms of the original leases outside of the specific enumerated circumstances would render inclusion of the circumstances under which the original lease could be invoked superfluous, which is contrary to well-settled cannons of contract construction. *150 Broadway N.Y. Assocs., L.P. v. Bodner*, 14 A.D.3d 1, 6, 784 N.Y.S.2d 63, 66 (1st Dept.2004).

### B. *Bankruptcy Law: Pegasus's Rights Under an Assumed Lease*

■ Pegasus also asserts that it has a claim for rejection damages under bankruptcy law because of the losses it suffered by permitting Avianca to assume the leases at a lower rate. These losses, Pegasus argues, are similar to those that it would have sustained if the leases had been rejected and Pegasus had been forced to relet the aircraft at a loss. Pegasus implies in its papers (but does not directly state) that it finds support for this claim in § 365 of the Code.

Pegasus has no support for its position in § 365 or any other provision of the Bankruptcy Code. When an executory contract is rejected under § 365, § 502(g) provides that the party has rejection damages in the form of a prepetition claim. However, Avianca did not reject the relevant Pegasus leases—it assumed them—and it is irrelevant what would have happened if

the leases had been rejected. The fact of the matter is, Avianca assumed the leases *as modified.*

The Code makes no allowance for rejection damages for an assumed lease. "Under the Bankruptcy Code, a lease that *has been assumed* under a plan pursuant to section 365 does not give rise to a claim." *Wainer v. A.J. Equities, Ltd.,* 984 F.2d 679, 684–85 (5th Cir.1993) (emphasis in original) (per curiam affirmance of District Court decision). The same rule applied under the prior Bankruptcy Act. As the court held in *Federal's Inc. v. Edmonton Inv. Co.,* 555 F.2d 577, 581 (6th Cir.1977), a claim arises only after rejection.

There is a wholly separate mechanism to compensate an injured lessor for damages incurred by a debtor's assumption of a lease or executory contract. In such situations, the Code requires that the debtor "cure" any default, compensate the other party to the contract for its losses, and provide adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1). However, § 365(b)(1) requires a cure only of present defaults, not defaults not yet in existence. *In re R.H. Macy & Co., Inc.,* 236 B.R. 583, 591 (Bankr.S.D.N.Y.1999). Moreover, Pegasus compromised its right to a "cure payment," providing explicitly in the Pegasus MOU to an 18–month installment plan by which Avianca would pay Pegasus the unpaid and outstanding portion of the rent and maintenance from the Petition Date through May 21, 2003. (Pegasus MOU, pp. 2–3.) Pegasus gave up its bankruptcy claim to cure payments for future amounts that *would have been due* under the original leases if those leases had been assumed in their original form.

Pegasus argues that it does not, in the documents, waive its claim to rejection damages in connection with the assumed leases. It correctly states that waiver is the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable, citing *In re Kizelnik,* 190 B.R. 171, 180 (Bankr. S.D.N.Y.1995). While Pegasus has provided the Court with an accurate definition of "waiver," it has failed to correctly apply the concept of waiver to the circumstances at hand.

The *Kizelnik* court stated that the essential elements of the equitable doctrine of waiver are "an existing right, benefit, or advantage ... knowledge, ... and an actual intention to relinquish it. . . ." *Id.* Here, the Court need look no further than the first element to determine that the doctrine of waiver is inapplicable. Pegasus never possessed a claim to rejection damages under leases that were assumed. For Pegasus to have retained such a right, and if it had been the intention of the parties that this right be reserved, it would have to be *explicitly* provided for in the papers. *Automotive Mgmt. Group, Ltd. v. SRB Mgmt. Co., Inc.,* 239 A.D.2d 450, 451, 658 N.Y.S.2d 54, 55 (2d Dept.1997). It was not.[6]

## C. *Extrinsic Evidence*

 Finally, Pegasus attempts to introduce extrinsic evidence to show the "true meaning" of the contract. However, the Court finds that the Pegasus documents are not ambiguous and that parol evidence cannot be used to vary their plain meaning, even though the written agreement of the parties is contained in more than one document. Even where a written

---

**6.** As noted above, the reservation of rights with respect to the rejected aircraft and engine leases is much broader than the language regarding the assumed leases, reserving "all claims ...". This again confirms the plain intent of the parties in the Pegasus MOU.

contract is not fully integrated, and except in circumstances not applicable here, "where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing." RESTATEMENT (SECOND) OF CONTRACTS § 215 (1981); see *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989); *Laskey v. Rubel Corp.*, 303 N.Y. 69, 72, 100 N.E.2d 140, 141 (1951). *South Road Assocs., LLC, v. Int'l Bus. Machs. Corp.*, 2 A.D.3d 829, 831, 770 N.Y.S.2d 126, 128 (2d Dept.2003); *In re Ajar*, 237 A.D.2d 597, 600, 655 N.Y.S.2d 608, 610 (2d Dept. 1997); *In re Okura & Co.*, 249 B.R. at 603; 11 WILLISTON ON CONTRACTS § 33:42 (4th ed.2004).

In any event, the weight placed on parol evidence by Pegasus is misplaced.

The first piece of parol evidence is an email sent by The Seabury Group, LLC (financial advisors to Avianca) to Pegasus early in the negotiation process proposing a settlement of the issues between the parties. The proposal included the *possibility* of allowing Pegasus damages in the form of a general unsecured claim for the entire proposed lease rate reduction. However, the email states at the outset that its contents are intended "for discussion purposes and without prejudice," expressly stating "this proposal has not been approved by Avianca." (Seabury Email of May 7, 2003.) It does not evidence what the parties agreed to in the Pegasus MOU and the Lease Amendments.

■ Pegasus also asserts that the parties, in the process of negotiating the Pegasus MOU, discussed the fact that rent reductions and term alterations for the retained aircraft leases would result in damages or losses to Pegasus, just as if Avianca had rejected the aircraft and Pegasus had been forced to relet the aircraft

to other carriers. Pegasus further contends that during the course of negotiations, Avianca never indicated that Pegasus would not be entitled to assert damage claims based on the rent differentials. None of this overcomes the fact that the documents (i) are inconsistent with any reservation of rights and (ii) do not provide Pegasus with the rights it claims. The negotiations leading up to an agreement are not admissible evidence to prove the "actual intent of the parties at variance with the words of the writing when those words are given their appropriate local meaning." 11 WILLISTON ON CONTRACTS § 33:42 (4th ed.2004).

■ Finally, Pegasus argues that parties to aircraft leases in other Chapter 11 cases have in certain cases documented an explicit waiver of lease rejection damages, and that there is a "business practice" in Chapter 11 cases to exclude such damages where they are not intended to be preserved. They offer as proof documentation relating to aircraft leases in one of the Chapter 11 cases involving TWA Airlines. Whatever may have been drafted in another case, this is not an issue on which an ambiguity needs to be clarified by general business practices. *Kirschten v. Research Insts. of America, Inc.*, No. 94 Civ. 7947(DC), 1997 WL 739587, *9 (S.D.N.Y. Sept.24, 1997). Where a contract is unambiguous, it is unnecessary for the court to resort to extrinsic evidence such as business practice to interpret it. *Pirrera v. Bath & Tennis Marina Corp.*, 2 A.D.3d 613, 614, 769 N.Y.S.2d 565, 566 (2d Dept. 2003). As stated above, it is clear from the documents what these parties provided for on the issue at bar.

## II. *The Ansett Claim*

Ansett also asserts rejection damages under the modified leases that Avianca assumed pursuant to the Ansett MOU.

The rationale as to why Ansett cannot claim rejection damages in the context of a lease assumption under bankruptcy law is very similar to that applied to Pegasus in the prior section of this decision; however, the language of the contracts is somewhat different.

### A. *The Contractual and Bankruptcy Claims*

■ Ansett points to Paragraphs 1.1 and 1.5 of the amended leases, entitled "MOU and Order" and "Prepetition Claims; Postpetition Claims" respectively, in support of its position that it reserved a right to rejection damages under the assumed modified leases. However, as with similar (albeit not identical) clauses addressed above with respect to the Pegasus MOU, the language in those sections is modified by clauses which exclude Ansett's construction.

Paragraph 1.1 of the Ansett MOU, governing the leases that were to be assumed as modified, provides that Ansett will retain a right to a prepetition claim in the amount of the cure payment. Ansett argues that the cure payment should be construed to include the entire difference between the original lease rate and the lower, amended lease rate for the full term of the leases. However, Paragraph 1.1 also contains qualifying language providing that Ansett has a right to prepetition claims "except as otherwise set forth in the MOU and Order." The Ansett MOU provides that the new rental rate under the amended and assumed leases became effective *as of the Petition Date.* (Ansett MOU, p. 3.) Therefore, Ansett holds a prepetition unsecured claim calculated on the basis of the original lease rent only for the period prior to the Petition Date when the original terms of the leases still controlled the obligations of the parties. Under the terms of the An-

sett MOU, from the Petition Date forward, there is no lease rate differential— merely a new lease rate that establishes the obligations of the parties.

Paragraph 1.5, likewise, is misconstrued by Ansett. That paragraph, entitled "Prepetition Claims; Postpetition Claims," provides: (i) "claims for damages Lessor may have against Lessee arising out of or relating to any Event of Default arising under the Lease" prior to May 21, 2003, would be treated as prepetition claims, and (ii) defaults that occurred on or after May 21, 2003, would be treated as postpetition claims and granted administrative expense priority. (Ansett Lease Amendments, ¶ 1.5, p. 3.) The first clause merely provides Ansett with a right to claim as prepetition damages "any claims for damages [Ansett] may have against [Avianca] arising out of or relating to any Event of Default arising under the Lease Agreement during the period" prior to May 21, 2003. (Ansett Lease Amendments, ¶ 1.5, p. 3.) This is the cure amount and covers only the period up to the date of the MOU. Furthermore, even this right is limited; Ansett agrees to accept, in lieu of a single cure payment for rent owed by Avianca from the Petition Date to May 21, 2003, 24 monthly installments to be paid at the new rates, without interest, commencing on the first rent payment date under the new leases. (Ansett MOU, pp. 3, 5.) Clause (ii) above pertains to the period after the date of the MOU, but it only has effect if there is a subsequent event of default. Absent a default, and there has been none, there is no provision at all for retention of a claim for rejection damages.

■ Ansett's principal argument that it retained an unsecured claim to the difference in rent between the original and modified leases is based on § 15(d) of the leases. Section 15(d) was an original term of the leases, and it was preserved in the

leases as amended. It is quoted above. Ansett asserts that the retention of this clause in the amended leases provides it with a right to rejection damages.

■ The Court need only implement the plain reading of § 15 to determine that no claim for rejection damages was preserved there. Section 15(d) provides Ansett with the right to the difference between the old and new lease rates if there is a default on the part of Avianca *and* Ansett "relet[s] the Aircraft ... to a third party unrelated to Lessor ...". As there has not been a re-leasing of the aircraft to a third party, and Ansett has continued to lease the aircraft to Avianca itself, § 15(d) is inapplicable to the matter at hand. Moreover, there has been no post-MOU default. As stated above, the Court is not at liberty to disregard clear language enunciating the parties' intent to render new meaning to a contract. See *In re Okura*, 249 B.R. at 603 stating, "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used."

Like Pegasus, Ansett argues that it never waived its right to rejection damages under the leases as modified. As noted above, however, Ansett's rights to prepetition damages were preserved only "except as otherwise set forth in the MOU and Order." The MOU and Order exclude any claim for rejection damages in respect of the assumed leases. Moreover, as in the Pegasus MOU, the Ansett reservation of claims with respect to the rejected leases is broader than its reservation regarding the assumed leases. This confirms the intent of the Ansett MOU not to retain for Ansett a rejection damages claim relating to the assumed leases.

### B. *Extrinsic Evidence and Estoppel*

Ansett also claims, like Pegasus, that the drafting history of the agreements supports its contention that it is entitled to rejection damages for the modified, assumed leases. Parol evidence is inappropriate for the reasons set forth above with respect to Pegasus. Nor are Ansett's invocations of the drafting history more persuasive. Ansett specifically argues that it rejected a clause that Avianca's counsel proposed for insertion in the amended leases that would have expressly waived a rejection damages claim for the assumed leases. It contends that this establishes the viability of its claim. But the fact that Avianca did not insist on a version of the lease amendments that contained an express waiver clause does not prove that the right was retained. *Cf. Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 885 (2d Cir.1995). In the words of Ansett's affiant, the drafting of the lease amendments admittedly involved "much discussion" and redrafting, and Avianca could have correctly concluded that there was no need for a waiver clause to carry out the parties' intention as set forth in the MOU. As stated above, the writings here are unambiguous, and the Court can look no further than the documents to determine the intent of the parties. For that reason, as further discussed above with respect to Pegasus, parol evidence of prior or contemporaneous negotiations cannot be used to construct a meaning for the contract that contravenes what the parties unambiguously expressed in writing.

Finally, Ansett asserts a claim sounding in estoppel. Ansett argues that it filed proofs of claim based on its perceived right to damages, that the proof of claim included an express demand for rejection damages in respect of the assumed leases, that Avianca was on notice that Ansett believed it held such a right, and that Avianca did not contest the proofs of claim until nearly a year later but rather proceeded with the

lease amendments in the interim. It contends that Avianca should not now be permitted to dispute the rejection damages claim.

A debtor may under certain circumstances be equitably estopped as a consequence of its prior conduct. *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1137 (2d Cir.1994); *In re Okan's Foods, Inc.*, 217 B.R. 739, 752 (Bankr.E.D.Pa.1998). Here, Avianca did wait nearly a full year before it filed an objection to Ansett's proofs of claim. However, this is not evidence that Avianca entered into the lease amendments in bad faith. Avianca's objections to the proofs of claim were timely, and there is no evidence that it had even examined the proofs of claim at the time the lease amendments were entered into. There is nothing in the record to indicate that the lease amendments were not agreed to at arm's length by two parties that were each well-represented and had substantial bargaining power.

In short, the Ansett lease amendments had to be consistent with the Ansett MOU. Ansett did not reserve any right to a rejection damages claim for the assumed leases in the MOU, and such a right did not have to be preserved. Ansett cites *Eastern Air Lines, Inc. v. Ins. Co. of the State of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999–1000 (2d Cir.1996), for the proposition that when a party accepts the benefits of a contract, he is "estopped from renouncing the burdens the contract places upon him." (Resp. to Debtor's Obj. to Claim of Nov. 1, 2004 at 17 fn.9.) Be that as it may, the contract does not place any burden on Avianca that Avianca now seeks to avoid.

## CONCLUSION

For the reasons stated above, the claims of Pegasus and Ansett for rejection damages in connection with Avianca's assumption of the modified aircraft leases are denied. Avianca is directed to settle appropriate orders on five days' notice.